698 So.2d 658 (1997)
Arlton Gregory EPPINETTE and Sherry Myers Eppinette, Plaintiffs-Appellants,
v.
CITY OF MONROE, Phillips Contracting and Liberty Mutual Insurance Co., Defendants-Appellants.
No. 29366-CA.
Court of Appeal of Louisiana, Second Circuit.
June 20, 1997.
Order Denying Rehearing August 22, 1997.
*661 Dennis Hennen, Monroe, for Arlton and Sherry Eppinette.
Theus, Grisham, Davis & Leigh by David H. Nelson, Monroe, for Phillips Contracting and Liberty Mutual Insurance Co.
*662 Nanci S. Summersgill, Assistant City Attorney, for City of Monroe.
Brady D. King, II, Monroe, for Riverwood International and John Hancock Mutual Life Ins. Co.
Before NORRIS, WILLIAMS and GASKINS, JJ.
GASKINS, Judge.
The plaintiffs, Arlton Gregory Eppinette and Sherry Myers Eppinette, filed suit against the defendants, the City of Monroe, Phillips Contracting and Liberty Mutual Insurance Company, for damages arising from an electrical shock injury sustained by Mr. Eppinette at the Monroe Regional Airport. Because the City of Monroe, a political subdivision which cannot be tried by jury, was included as a defendant, the trial was bifurcated. The trial court decided liability and damages against the City of Monroe and a jury determined liability and damages against Phillips Contracting (Phillips) and its insurer, Liberty Mutual Insurance Company. The judge and jury arrived at different allocations of fault among the defendants and made different awards for the various elements of the plaintiffs' damages. The plaintiffs appealed, asserting that the disparate jury and trial court verdicts in a bifurcated trial demand a de novo review by this court and arguing that the damages awarded by both judge and jury were excessively low.
The City of Monroe also appealed the judgment, arguing that the trial court erred in assessing it with 25% fault in the accident and erred in failing to rule on its claim against Phillips for indemnification.
We now review the record to consider the arguments raised by the parties and to resolve the differences in the factual findings between the trial court and the jury in this bifurcated proceeding. For the following reasons, we affirm in part, reverse in part and vacate in part the decisions of the jury and trial court.

FACTS
Arlton Gregory Eppinette and his wife, Sherry Myers Eppinette, took their minor son to the Monroe Regional Airport on the night of May 24, 1991 to watch the planes land. Mr. Eppinette walked to the chain link security fence surrounding the airport to watch the planes. The fence was not completed and was being installed by Phillips Contracting Company. Mr. Eppinette placed one hand on a post of the fence without consequence. However, when he leaned against another post, an electrical current passed through his body, rendering him motionless. After about thirty seconds, Mr. Eppinette fell away from the fence, but could not speak and had difficulty moving and breathing. He was taken by ambulance to the hospital. Mr. Eppinette was admitted to the critical care unit of the hospital and treated for right shoulder pain, left arm pain, upper back pain, burning eyes and muscle spasms in his neck and back. He was released from the hospital on May 29, 1991.
Following his discharge from the hospital, Mr. Eppinette was treated by Dr. Warren Daniel, Jr., who found him to have severe pain and weakness in the right shoulder with a 50% decrease in range of motion, chest and back pain, hand problems and generalized weakness. He was treated by a psychiatrist for depression. He also saw an orthopaedic surgeon who diagnosed him with fibrotic muscle changes caused by the electrical shock.
The City of Monroe owns the airport. On April 18, 1991, Phillips entered into a contract with the City of Monroe for the construction of a new metal chain link security fence around the airport. While digging a post hole with an auger, a worker for Phillips, Danny Wayne Westerman, cut through a conduit containing electrical wiring. Cleve Norrell, the airport director, was contacted. Phillips says Mr. Norrell told workers that the wire was dead and abandoned and to go ahead with placement of the fence. The City contends that Mr. Norrell thought the wires led to an old flight service station and informed Phillips that the fence could be moved over a foot or two to avoid the wires. The fence was not moved and the post was set on top of the electrical wiring. Apparently the wires were attached to a power source and became energized when the night lights *663 at the airport came on. Therefore, no electricity was flowing to the wires during the day while the construction crew worked, but the fence was electrified at night when the lights came on.
Mr. Eppinette was employed at Riverwood International as a heavy manual laborer working on a paper machine. Although he was released from the hospital a few days after the accident, he was deemed to be unable to work from May 24, 1991 through March 1, 1992. During this time, Mr. Eppinette was on a sick leave of absence and was paid short term disability benefits in the amount of $132 per week.
On March 1, 1992, the plaintiff returned to work at a temporary storeroom job which was not as physically demanding as his previous position working on the paper machine. Mr. Eppinette continued to experience right shoulder pain and was eventually seen by Dr. John Ferrell, an orthopaedic surgeon who diagnosed a rotator cuff tear caused by the airport accident. Surgery was performed to correct this problem on June 23, 1993. The plaintiff was again on sick leave disability from that date until May 16, 1994. During that time he was treated by a neurologist, Dr. Juanita McBeath, for migraine headaches that became more severe after the accident. In February 1994, the plaintiff was evaluated by an ear, nose and throat doctor for a muscle knot behind his ear which was found to be caused by the airport accident.
Almost one year after the shoulder surgery, Mr. Eppinette was released to return to work on May 16, 1994. He returned to work in a labor pool job. Shortly after his return, Dr. Ferrell placed a restriction upon his activities, specifying that he perform no work with his right shoulder or arm above the shoulder level. A labor team at Riverwood determined that Mr. Eppinette could not perform the labor intensive job. He was returned to sick leave disability on June 5, 1994. His disability payments expired in late 1994. Mr. Eppinette was off work from June 5, 1994 until June 23, 1995, when he returned to work at Riverwood as a quality control tester.
In May 1992, Mr. Eppinette filed suit against the City of Monroe, Phillips Construction Company and their insurer, Liberty Mutual Insurance Company. His wife, Sherry Myers Eppinette, joined in the suit for loss of consortium. The City of Monroe filed a cross claim against Phillips Construction Company for indemnification should the City be cast in judgment. Riverwood International filed an intervention to recover medical expenses and disability paid on behalf of Mr. Eppinette.[1]
The matter was heard in a bifurcated trial on July 24-28, 1995. The jury heard the issues of the liability and damages as to Phillips Construction Company. Because La. R.S. 13:5105 prohibits a jury trial in a suit against a political subdivision, the trial court decided the issues of liability and damages as to the City of Monroe. The trial court did not give reasons for it judgment, but assessed fault at 25% to the City of Monroe and 75% to Phillips and Liberty Mutual. The jury assessed fault at 50% to the City of Monroe and 50% to Phillips and Liberty Mutual. The trial court and jury then awarded damages to the plaintiffs as follows:

 Trial court Jury
Pain and suffering $ 35,000.00 $ 15,000.00
Mental anguish 25,000.00 15,000.00
Past lost wages 26,847.92 25,000.00
Future wages/lost earning
capacity 34,000.00
Medical expenses 31,536.92 12,000.00
Loss of consortium 12,500.00 10,000.00
Total $130,884.84[2] $111,000.00

The trial court signed and filed a written judgment on April 3, 1996, awarding damages to the plaintiffs in the amount of $32,720.98 (25% of the court's total damage award of $130,883.92) against the City of Monroe and $55,000 (50% of the jury's damage award of $111,000) against Phillips Contracting *664 and Liberty Mutual Insurance Company.
The plaintiffs appealed, arguing that the trial court and jury inaccurately allocated fault among the defendants and that the amount of damages awarded to the plaintiffs was excessively low. The City of Monroe also appealed, arguing that the trial court erred in assessing fault against the City at 25% and in failing to rule on the City's claim for indemnification against Phillips.

STANDARD OF REVIEW
The threshold question in this case is the proper standard of review to be applied by this court in a bifurcated case where the jury and trial court render inconsistent verdicts. The plaintiffs and Phillips argue that the proper appellate standard in such a case is de novo. The City contends that the verdicts are not necessarily inconsistent because the judge and jury found both the City and Phillips to be partially at fault in causing the accident which injured Mr. Eppinette. We find that, in this case, the trial court and jury did reach inconsistent verdicts.
The proper standard of appellate review in bifurcated trials with inconsistent verdicts is not a settled question. A split exists in the circuits regarding the proper standard. This court and the fourth circuit have held that the proper standard is a de novo review of the record, without according any weight or deference to the factual findings of the judge or jury. Mayo v. Audubon Indemnity Insurance Company, 26,767 (La.App.2d Cir. 1/24/96), 666 So.2d 1290, writ denied 96-0457 (La.4/1/96), 671 So.2d 325; Reichert v. State, Department of Transportation and Development, 26,800 (La.App.2d Cir. 5/8/96), 674 So.2d 1105, writs granted 96-1419 and 1460 (La.9/27/96), 679 So.2d 1357; Smiley v. Sikes, 543 So.2d 1084 (La.App. 2d Cir.1989), writ denied 548 So.2d 326 (La.1989). See also Beoh v. Watkins, 94-1086 (La.6/24/94), 640 So.2d 1325; McCullough v. Regional Transit Authority, 593 So.2d 731 (La.App. 4th Cir. 1992), writ denied 595 So.2d 655 (La.1992). However, the first and third circuits have adopted a different standard which accords deference to the factual findings of the judge and jury and attempts to harmonize inconsistent results. Thornton v. Moran, 348 So.2d 79 (La.App. 1st Cir.1977); Felice v. Valleylab, Inc., 520 So.2d 920 (La.App. 3d Cir. 1987), writs denied 522 So.2d 562, 563 (La. 1988).
In Reichert v. State, Department of Transportation and Development, 26,800 (La. App.2d Cir. 5/10/95), 656 So.2d 47, (Reichert I), this court found that evidence in a bifurcated suit against the state and a private party was improperly admitted by the trial court, tainting the factual findings of the judge and jury. Therefore, on this basis, and not because the judge and jury reached inconsistent verdicts, this court found that the proper standard of appellate review was de novo. We then found that the State of Louisiana was not at fault in causing the accident.
The Louisiana Supreme Court granted writs in that case, finding that this court erred in holding that the evidence was not admissible and stating, "Therefore, the court erred in making a de novo assessment of liability without deference to either verdict." This court's judgment was vacated and the case remanded with instructions to render a judgment after proper deference to the jury verdict and the judgment of the trial court. Reichert v. State, Department of Transportation and Development, 95-1775, 95-1740 (La.2/9/96), 667 So.2d 542.
On remand, this court noted that the judge and jury in the bifurcated proceeding reached inconsistent verdicts on the allocation of fault between the state and the private party. On that basis, this court once again determined that the appropriate standard of review was de novo. Reichert v. State, Department of Transportation and Development, 26,800 (La.App.2d Cir. 5/8/96), 674 So.2d 1105 (Reichert II). This court then considered the exhibits ruled admissible by the Louisiana Supreme Court, and determined that they were favorable to the state. Consequently, this court again found that the state was not at fault in causing the accident.
The Louisiana Supreme Court again granted writs. Reichert v. State, Department of Transportation and Development, 96-1419 and 96-1460 (La.9/27/96), 679 So.2d 1357. That court then reversed its prior position *665 taken in the writ grant in Reichert I, and found, as this court originally held, that the questioned exhibits were not admissible. The result reached by this court was affirmed. See Reichert v. State, Department of Transportation and Development, 96-1419 (La.5/20/97), 694 So.2d 193. Because the court found that the evidence considered by the trial judge and jury was not admissible, thereby tainting their factual determination, the Louisiana Supreme Court found the de novo review correct. Therefore, the supreme court pretermitted the issue of the proper standard of review for bifurcated proceedings resulting in inconsistent findings.
However, the issue of the proper standard of appellate review in bifurcated proceedings with inconsistent results is now squarely before this court for decision. Recognizing the aforementioned split on this issue among the intermediate appellate courts of this state, we have reexamined the issue and now conclude that in such cases, the reviewing court should accord some deference to the factual findings of the judge and jury, if possible, and should attempt to harmonize the inconsistent verdicts.[3]
We find that the procedure set forth in Thornton v. Moran, supra, is sound and is to be applied in resolving inconsistent trial court and jury verdicts in bifurcated proceedings. In Thornton v. Moran, supra, the court held that an intermediate appellate court, in bifurcated cases, is required to reconcile or resolve any differences in the factual findings between the trial judge and the jury by determining which witnesses are more credible, to ascertain which of the triers of fact accorded a more reasonable measurement to the evidence in reaching a decision, and to decide which of the said triers of fact gave a more reasonable evaluation and drew a more reasonable inference from the facts, in order to harmonize the judgments. Said another way, after concluding that a conflict exists, there must then be a determination that the findings of fault and apportionment and the award of damages were reasonable and not manifestly erroneous. In the event that the finding by one fact finder is manifestly erroneous and the other is not, then the manifestly erroneous determination is discarded and the finding which is not manifestly erroneous will stand.
Finally, if conflicting findings are not manifestly erroneous, then the court must, after a careful review of the entire record, examine each inconsistent reasonable finding to determine which fact finder's finding is more reasonable. Thornton v. Moran, supra.
The approach adopted by the first circuit initially requires a determination that a conflict exists between the trial court's finding and the jury's finding. In the present case, both the trial court and the jury had the authority to make a determination as to fault and the apportionment thereof as well as the amount of damages to be awarded. These findings were inconsistent, therefore, a conflict in the verdicts in the present case exists. We particularly note that the disparate verdicts contain several inconsistencies which are significant. First, even though the total damages awarded to the plaintiff by the jury and the trial court were $111,000 and $130,884.84, respectively, and even though the plaintiff was not contributorily negligent, the judgment gives the plaintiff only $87,720.98 in damages. This resulted from the trial court's effort to harmonize the two inconsistent verdicts. Further, the trial court awarded twice as much as the jury for general damages, more than twice the jury's award for medical expenses and the trial court made no award for lost future wages or lost earning capacity, while the jury made a significant award for this element of damages. Accordingly, we now apply the additional factors set forth above to synchronize the inconsistent findings of the jury and the trial court.

ALLOCATION OF FAULT
In the present case, both the trial court and the jury found the City of Monroe and Phillips Contracting to be at fault in causing the harm suffered by Mr. Eppinette. However, the trial court found the City to be 25% and Phillips 75% at fault, while the jury *666 found the City and Phillips to each be 50% at fault. Because these findings are inconsistent, we must determine whether either finding was manifestly erroneous and if not, which finding was more reasonable. In determining whether to impose liability under La. C.C. art. 2315, the duty/risk analysis is employed, which consists of the following four-prong inquiry:
I. Was the conduct in question a substantial factor in bringing about the harm to the plaintiff, i.e., was it a cause-in-fact of the harm which occurred?
II. Did the defendant(s) owe a duty to the plaintiff?
III. Was the duty breached?
IV. Was the risk, and harm caused, within the scope of protection afforded by the duty breached?
Mathieu v. Imperial Toy Corporation, 94-0952 (La.11/30/94), 646 So.2d 318.
Under a duty/risk analysis, all four inquiries must be affirmatively answered for plaintiff to recover. As such, in order for liability to attach under a duty/risk analysis, a plaintiff must prove five separate elements: (1) the defendant had a duty to conform his or her conduct to a specific standard of care (the duty element); (2) the defendant failed to conform his or her conduct to the appropriate standard (the breach of duty element); (3) the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and, (5) actual damages (the damages element). Mathieu v. Imperial Toy Corporation, supra.
It is also argued that the City may be strictly liable for the damage sustained by the plaintiffs in this case. The owner of a building is answerable for damages occasioned by its ruin when this is caused by neglect to repair it, or when it is the result of a vice in its original construction. La. C.C. art. 2322. Further, La. C.C. art. 2317 provides in pertinent part that, "we are responsible not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody."
Phillips Contracting was hired by the City of Monroe to construct a fence on property owned by the City. A separate company, Ford, Bacon and Davis, was in charge of engineering on the project. According to the terms of the contract, Phillips was to remove underground structures encountered in the project, repair underground structures damaged by their work and was to consult the engineer on the project when underground structures not listed on the project blueprints were encountered. At a preconstruction meeting, it was specified that Cleve Norrell, the airport director, would be the central contact between the contractor and the tenants.
It is not disputed that while working for Phillips on the airport fencing project, a workman, Danny Westerman, cut into a conduit containing electrical wiring. When he hit the wiring with his auger, Mr. Westerman did not experience an electric shock.
Paul Phillips, Jr., the owner of Phillips Contracting Company, acknowledged that under the terms of the contract between his company and the City, electrical wires that were damaged during fence construction were to be repaired by Phillips. He stated that when unknown electrical lines such as these are encountered on a job, his workers go to the person in charge to have them make a decision as to what the line goes to, "where it is, what is to be done with it, are we to repair it, is it a dead line, abandoned or what."
Paul Clifford Phillips, III, general supervisor of the fence project, was present at the airport on the day the line was cut. The lines were not shown on the blueprints provided by the City. He stated that Mr. Norell said the line was dead and acted like it was "OK for them to proceed with the fence." He also stated that he later confirmed with Mr. Norrell that there was no power to the line and stated that Mr. Norrell did not ask them to move the line.
John Pymm, an employee of Phillips, was the foreman in charge of the fencing project. He stated that on such projects, the utility *667 companies mark their lines prior to the commencement of work and then the customer is to mark all other lines not owned by a utility. He testified that the blueprints he was given did not show the conduit and the electrical wiring at issue here. He stated that when electrical lines are found, he tries to contact someone who can identify the line. In this case, he contacted Mr. Norrell, the airport director. According to Mr. Pymm, Mr. Norrell said this was a dead line and said "if you want to move, you can move." Mr. Pymm stated that Mr. Norrell did not say anything about the line running to a building at the airport. He testified that he asked Mr. Norrell if there was anything else he knew about and was told there was not and to "go ahead on." Mr. Pymm stated that he thought Mr. Norrell notified the project engineer.
Danny Wayne Westerman, the Phillips worker who cut into the electrical line with an auger, stated that Mr. Norrell said the line was abandoned and that they "could go ahead and keep digging." He stated that he did not hear Mr. Norrell say that they could move the fence a couple of feet.
Clarence Cleveland Norrell testified that he was employed by the City of Monroe as the airport director. He stated that he was informed when the Phillips fence crew cut into the electrical lines. He looked at the apparent route of the wires and made the assumption that the wires were running from the control tower to the old flight service station which was no longer in use. He stated that he did not request that Phillips repair the line, but told the crew "as far as I was concerned, he could move over a foot or two in order to miss what we thought was the apparent line." He denied ever saying that the line was dead or abandoned. He acknowledged that the parties had previously agreed that all work was to be coordinated with the airport manager's office.
Based upon these facts, we find that neither the trial court nor the jury was manifestly erroneous in finding that both Phillips Contracting and the City of Monroe were negligent in this case. Phillips Contracting was negligent in installing the metal fence post on a damaged conduit containing electrical wires. Phillips had a contractual duty to remove underground structures, to repair structures damaged by their work and to contact the project engineer when unknown structures were encountered. Knowingly placing the metal fence post on exposed electrical wires without repairing the damage to the conduit, without determining that the wires were not connected to a power source or moving the fence was a cause in fact of the harm sustained by the plaintiffs.
The City of Monroe was also negligent in that Mr. Norell, the city employee in charge of managing the airport, had actual knowledge that the conduit had been damaged and electrical wires were exposed. After being made aware of this fact, Mr. Norell took no action to determine whether the lines were connected to a power source and did not undertake to ensure that the conduit was repaired, the line was removed, or that the post was not placed on top of the exposed electrical wiring.
In determining percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed. Watson v. State Farm Fire and Casualty Insurance Company, 469 So.2d 967 (La.1985).
In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including, (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actors, (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. Watson v. State Farm Fire and Casualty Insurance Company, supra.
In applying these factors to the facts of this case, we find that neither the trial court nor the jury was manifestly erroneous in their allocations of fault between the City of Monroe and Phillips Contracting. However, we determine that the trial court's allocation of 75% fault to Phillips and 25% to the City of Monroe was the most reasonable. Therefore, we reverse and vacate the jury's *668 allocation of fault in this case and affirm the allocation made by the trial court.

INDEMNITY
The City of Monroe argues that it is entitled to indemnity from Phillips for any amount it may be ordered to pay the plaintiffs. The City contends that, under the terms of the contract with Phillips, the company is bound to indemnify the City. The City also argues that if liable at all, it is only strictly liable for the plaintiffs' damage and therefore, Phillips, whose actions caused the damage, is required to indemnify the City.
The City argues that its claim for indemnification arises from its contract with Phillips. Under the contract, Section 70-14 provides that, until the "Engineer's written acceptance of the entire completed work ... the Contractor shall have the charge and care thereof and shall take every precaution against injury or damage to any part due to the action of the elements or from any other cause, whether arising from the execution or nonexecution of the work." That section also provides that the "Contractor shall rebuild, repair, restore and make good all injuries or damages to any portion of the work occasioned by any of the above causes before final acceptance and shall bear the expense thereof...."
The contract also provides in Section 40-06 that "All existing structures encountered within the established lines, grades, or grading sections shall be removed by the Contractor unless such existing structures are otherwise specified to be relocated, adjusted up or down, salvaged, abandoned in place, reused in the work or to remain in place.... Should the Contractor encounter an existing structure (above or below ground) in the work for which the disposition is not indicated in the plans, the Engineer shall be notified prior to disturbing the structure. The disposition of the existing structures so encountered shall be immediately determined by the Engineer in accordance with the provisions of the contract...."
Section 70-11 of the contract is an indemnification and "hold harmless" clause whereby the Contractor agrees to indemnify or save harmless the Engineer and owner and their officers and employees from "all suits, actions or claims of any character brought because of any injuries or damage received or sustained by any person, persons, or property on account of the operations of the Contractor; or on account of or in consequence of any neglect in safeguarding the work; or through use of unacceptable materials in constructing the work; or because of any act or omission, neglect, or misconduct of said Contractor...."[4]
The City argues that Phillips' failure to abide by the provisions of the contract, particularly in failing to contact the engineer when encountering the unidentified electrical wires, was the sole cause of the electrical shock to Mr. Eppinette. Therefore, the City argues that under the terms of the contract, it is entitled to indemnity from Phillips for any amounts it may be ordered to pay the plaintiffs. We agree that Phillips violated certain terms of the contract and that its actions were a cause of the harm suffered by the plaintiffs. However, we do not find that Phillip's actions were the sole cause of the plaintiffs' harm.
The City argues that it is only strictly liable and was not actually negligent in this case and therefore, is entitled to indemnification from Phillips. In Dusenbery v. *669 McMoran Exploration Company, 458 So.2d 102 (La.1984), it was held that indemnity is available in some (but not all) cases of strict liability. Indemnity shifts the entire loss from a tort feasor only technically or constructively at fault to one primarily responsible for the act that caused the damage. Contribution apportions the loss among joint tort-feasors and requires each to pay his virile share of the damages that result from the wrong. If both tort-feasors are concurrently actively at fault, neither are entitled to indemnity. When liability to the injured party is imposed on one party on the basis of strict liability only and on a second party on the basis of negligence or actual fault, the strict liability defendant may recover full indemnity by incidental demand against the party actually at fault. While both defendants are liable to the injured party, the defendant who is liable only as the owner of the unreasonably dangerous structure should be made whole by the defendant who actually caused the unreasonable condition for which the owner is strictly liable. Travelers Insurance Company v. Empiregas, Inc. of Oak Grove, 545 So.2d 706 (La.App. 2d Cir.1989). Green v. TACA International Airlines, 304 So.2d 357 (La.1974).
As stated above, the City of Monroe was 25% at fault in causing the accident. Therefore, because the City is not liable solely under the theory of strict liability, it is not entitled to indemnity from Phillips. See and compare Williams v. City of Monroe, 658 So.2d 820 (La.App. 2d Cir.1995), writs denied 95-1988, 95-2017 (La.12/15/95), 664 So.2d 451.

DAMAGES
The plaintiffs argue that the amount of damages awarded by both the jury and the trial court was excessively low. In their brief, the plaintiffs outline in detail the medical and other expert opinions given at trial. The plaintiffs contend that they are entitled to damages in the following amounts:

Pain and suffering $ 75,000.00
Mental anguish 75,000.00
Medical expenses 31,536.92
Past lost wages 123,831.28
Future wages & /orlost earning capacity 349,480.07-818,230.87
Loss of consortium 25,000.00
Total $679,848.26-1,120,219.00

Phillips contends that the fence was charged with only a low voltage charge and that the injuries sustained by Mr. Eppinette were not severe. According to Phillips, Mr. Eppinette's rotator cuff problem was not diagnosed until long after the accident and after he had returned to work at Riverwood, leading to the inference that the rotator cuff tear was not caused by the electrical shock. It notes that the jury award for medical expenses excluded the expenses for the rotator cuff surgery. Phillips asserts that the plaintiff did not want to return to work because he was afraid of reinjuring his shoulder, not because he was physically unable to perform the job. Phillips also argues that Mr. Eppinette is not entitled to lost future wages because all the jobs he held after his injury paid more than the job he was doing before the injury.

General Damages
General damages are those which may not be fixed with pecuniary exactitude. They instead involve mental or physical pain or suffering, inconvenience, loss of intellectual gratification or physical enjoyment, or other losses of lifestyle which cannot be measured definitively in terms of money. Caldwell v. Smith, 25,956 (La.App.2d Cir. 8/17/94), 641 So.2d 1011. The primary objective of general damages is to restore the party in as near a fashion as possible to the state he was in at the time immediately preceding injury. Daigle v. United States Fidelity and Guaranty Insurance Company, 94 0304 (La.App. 1st Cir. 5/5/95), 655 So.2d 431.
The plaintiff bears the burden of proving a causal relationship between the accident and the injuries. A claimant's disability *670 is presumed to have resulted from an accident if, before the accident, he was in good health, but commencing with the accident, the symptoms of the disabling condition appear and continually manifest themselves afterwards, providing that the medical evidence shows there to be a reasonable possibility of a causal connection between the accident and the disabling condition. Harig v. State, Board of Elementary and Secondary Education, 25,702 (La.App.2d Cir. 3/30/94), 635 So.2d 485.
Dr. Troy Redman treated the plaintiff while he was hospitalized immediately after the accident. Dr. Redman stated that the plaintiff complained of muscle aches, anxiety, pain in the back, shoulders and arms and burning eyes. He also had a muscle spasm in the neck and upper back. The plaintiff was given a small amount of physical therapy while in the hospital.
Dr. Daniel saw the plaintiff approximately one week after the accident. The plaintiff's right shoulder was weak and painful. The plaintiff reported pain radiating to his chest and back and complained of pain in his hands. The plaintiff had generalized weakness and his right hand and forearm were swollen. Dr. Daniel noted tightness in the plaintiff's shoulder muscle and a 50 percent decrease in range of motion. Dr. Daniel explained that electric shock causes the muscles to contract. The plaintiff's symptoms were treated with anti-inflammatory medications, pain killers and physical therapy. By June 4, 1991, the plaintiff had improved to the point of having only a 30 percent decrease in range of motion. The plaintiff's complaints of shoulder pain persisted and in 1993 he was referred to Dr. Ferrell, the orthopaedic surgeon who diagnosed a rotator cuff tear. Surgery was performed to correct this defect in June 1993. By June 1995, Dr. Daniel noted that the plaintiff had only a 20 percent decrease in range of motion.
Dr. Ferrell testified by deposition that he first saw the plaintiff on May 31, 1993. The plaintiff complained of shoulder pain and it was determined that he had a partial tear in the supraspinatus tendon, which is part of the rotator cuff. Dr. Ferrell stated that the tear could have been caused by muscle spasms from the electrical shock. Arthroscopic surgery was performed on June 23, 1993. On May 16, 1994, the plaintiff returned to work, but several days later he again saw Dr. Ferrell, complaining of difficulties with his shoulder. At that time, Dr. Ferrell placed a restriction on the plaintiff's activities that he perform no work with his right shoulder or arm above the shoulder level. Dr. Ferrell assigned a 10 percent disability to the plaintiff's upper extremity.
Dr. Calvin Walker, a psychiatrist, had treated the plaintiff prior to this injury and after the accident, treated him for depression. Antidepressant medication was prescribed which the plaintiff ceased taking due to the cost.
The plaintiff saw Dr. Lawrence J. Danna, an ear, nose and throat specialist, complaining of a knot behind his right ear and pain in his jaw. Dr. Danna felt that these symptoms were related to the accident in 1991. Dr. Danna felt that the muscle contractions caused by the electrical shock caused the muscle knot.
Dr. Louis King Scott, a dentist specializing in temporomandibular joint disfunction (TMJ) saw the plaintiff on July 11, 1995 for his complaints of jaw pain. The plaintiff had all of his teeth, including his wisdom teeth, and reported that he had no difficulty sleeping. Dr. Scott stated that it is rare for a person with all their teeth to have TMJ and patients with the disorder have difficulty sleeping. A CT scan revealed no abnormalities in the plaintiff's jaw joint. Therefore, Dr. Scott determined that the plaintiff did not have TMJ.
Dr. Stephen Keith Horne, a family practice physician and company doctor for Riverwood, did a complete physical on the plaintiff and a functional capacity evaluation on January 30, 1992. He found that the plaintiff had a decreased range of motion in the right shoulder and decreased strength on the right side. Dr. Horne also stated that the muscle atrophy could be reversed with use. Dr. Horne stated that the plaintiff could do any type medium to moderate activity and felt that he could return to his previous position on the paper machine. The only reason Dr. Horne *671 could see for the lack of use of the shoulder was fear that further injury to the shoulder would result. The tests performed by Dr. Horne did not indicate that the plaintiff had a torn rotator cuff at that time.
Dr. William Phillip Osborne, whose practice is limited to impairment and disability assessment, reviewed the plaintiff's medical history and examined him on September 2, 1992. The only findings of note made by Dr. Osborne were a slight decrease in range of motion in the neck and a slight decrease in the right hand grasp. The range of motion in the shoulders, elbows, wrists and hands were all normal. The plaintiff was able to lift approximately 113 pounds "on isometrics," which qualified him for heavy work. Dr. Osborne found that the plaintiff did not exhibit an increased heart rate when performing motions he said were painful. Dr. Osborne felt that there were no signs of a rotator cuff tear and he could not identify any impairment to the plaintiff. However, Dr. Osborne agreed that after arthroscopic shoulder surgery, the plaintiff should not work above the shoulder level.
Dr. Don K. Joffrion, an orthopaedic surgeon, examined the plaintiff and found that he had a good result from his shoulder surgery. He stated that the plaintiff tended to embellish his problem, but agreed that Dr. Ferrell's assessment of a 10 percent disability to the upper extremity was a fair assessment. Dr. Joffrion also stated that the muscle knot behind Mr. Eppinette's ear would cause discomfort from time to time but would not cause any real physical limitation. He stated that this knot was most likely scar tissue on the muscle caused by the electrical shock.
The record shows that, prior to this accident, the plaintiff was a very strong, healthy twenty-eight year old man with a good work record at Riverwood. In this case, the plaintiff was subjected to a frightening injury causing him substantial pain. He had pain and muscle weakness with an initial decrease in range of motion. He also suffered depression, an increase in migraine headaches, fibrotic muscle changes, and a muscle knot behind his ear which was attributed to the electrical shock but which was not temporomandibular joint disease. As discussed above, the most substantial of the plaintiff's injuries was a torn rotator cuff which his treating physician, Dr. Ferrell, attributed to this accident. Correction of this condition required surgery. The record shows that the physical complaints noted by the plaintiff were caused by the electrical shock.
In this case, the trial court awarded the plaintiff $35,000.00 for pain and suffering and $25,000.00 for mental anguish while the jury awarded the plaintiff $15,000.00 for pain and suffering and $15,000.00 for mental anguish. We find that neither determination was manifestly erroneous, but the award by the trial court was the most reasonable. Further, we find that the trial court's award was not excessively low. Therefore, we reverse and vacate the jury's general damage award and affirm the general damage award made by the trial court.[5]

*672 Medical Expenses

A plaintiff may ordinarily recover reasonable medical expenses, past and future, which he incurs as a result of the injury. Dowe v. Grady, 540 So.2d 1040 (La.App. 2d Cir.1989). The trial court awarded medical expenses in the amount of $31,536.92. The jury awarded medical expenses in the amount of $12,000.00. Phillips argues that the jury did not award medical expenses for the surgery to correct the plaintiff's torn rotator cuff. However, we note that the jury did award a substantial amount for lost future earnings and lost earning capacity. If the jury did not consider the torn rotator cuff to be caused by the airport accident, then the award for lost future wages appears to be inconsistent. Therefore, we find that the jury's award of only $12,000.00 for medical expenses is manifestly erroneous and is reversed and vacated. The trial court's award of $31,536.92 in medical expenses is supported by the record and is not manifestly erroneous. Therefore, the trial court's award is affirmed.

Lost Past Earnings
It is the plaintiff's burden to prove past lost earnings and the length of time missed from work due to the accident. Past lost earnings are susceptible of mathematical calculation from proof offered at trial. Eddy v. Litton, 586 So.2d 670 (La.App. 2d Cir. 1991), writ denied 590 So.2d 1203 (La.1992); Daigle v. United States Fidelity and Guaranty Company, supra.
The trial court awarded the plaintiff lost past wages in the amount of $26,847.92, the amount the plaintiffs' economist, Ernest Richard Moser, determined the plaintiff lost during 1991, following the accident. However, the plaintiff did not return to work until March 1, 1992. The trial court did not award the plaintiff $8,624.67 that Mr. Moser testified was the plaintiff's lost income for 1992. Also, the trial court did not award the plaintiff any lost income following surgery for the torn rotator cuff. As stated earlier, the trial court did not give oral or written reasons for its decision.
The jury apparently awarded the plaintiff lost income for 1991, but rounded the amount down to $25,000.00. In applying the factors from Thornton II, supra, to this element of damages, we determine that both the trial court and the jury were manifestly erroneous in their award for lost past wages and both findings are reversed and vacated.
The record establishes that Mr. Eppinette was unable to work following this accident from May 24, 1991 until March 1, 1992. He establishes that his lost wages for this time period was $35,472.59. Therefore, he is entitled to recover this amount.
Also, because we have affirmed that portion of the trial court judgment granting Mr. Eppinette all medical expenses, including those associated with his rotator cuff surgery, we must necessarily find that the surgery was necessitated by the airport accident. Accordingly, we also find that Mr. Eppinette is entitled to recover lost wages for the time he was unable to work while recuperating from this surgery. The record shows that he was unable to work from the date of the surgery, June 23, 1993, until May 16, 1994. He then returned to work in the labor pool from May 16, 1994 until June 5, 1994. Due to the medical restriction on Mr. Eppinette that he not perform any work at or above the shoulder level, he was again placed on sick leave and was off work from June 5, 1994 until June 23, 1995, when a position was found for him within the necessary medical restriction. Mr. Eppinette's total lost wages for these time periods was $88,358.69. Therefore, Mr. Eppinette proved that as a result of this accident, he suffered lost past wages in the total amount of $123,831.28 and this court awards that amount.

Lost Future Earnings and Lost Earning Capacity
Awards for lost future income are inherently speculative and are intrinsically insusceptible of being calculated with mathematical certainty. The courts must exercise *673 sound judicial discretion in determined these awards and render awards which are consistent with the record and which do not work a hardship upon either party. Hunt v. Board of Supervisors of Louisiana State University and Agricultural and Mechanical College, 522 So.2d 1144 (La.App. 2nd Cir.1988). Factors to be considered in determining a proper award for lost future income are the plaintiff's physical condition before the injury, the plaintiff's past work history and consistency thereof, the amount the plaintiff probably would have earned absent the injury complained of, and the probability that the plaintiff would have continued to earn wages over the remainder of his working life. Morgan v. Willis-Knighton Medical Center, 456 So.2d 650 (La.App. 2d Cir. 1984).
In computing loss of future income, it is first necessary to determine whether and for how long the plaintiff's disability will prevent him for engaging in work of the same or similar kind that he was doing at the time of the injury; it is necessary to ascertain whether he has been disabled from work for which he is fitted by training and experience. Morgan v. Willis-Knighton Medical Center, supra.
Lost earning capacity is not necessarily determined by actual loss; damages may be assessed for what the injured plaintiff could have earned despite the fact that he may never have seen fit to take advantage of that capacity. Folse v. Fakouri, 371 So.2d 1120 (La.1979). Such damages are calculated on the person's ability to earn money rather than on what he actually earned before the injury. Harris v. Pineset, 499 So.2d 499 (La.App. 2d Cir.1986), writs denied 502 So.2d 114, 117 (La.1987).
Diana L. Herbst, a vocational rehabilitation consultant with a Ph.D. in sociology, reviewed the plaintiff's medical records and also spoke with Dr. Joffrion regarding restrictions on the plaintiff's work activities. Dr. Joffrion informed her that the plaintiff should not engage in continuous or repetitive activity at the shoulder level or above, but he thought it reasonable that Mr. Eppinette could do such activities two or three times per hour. Ms. Herbst also visited Riverwood and observed for 4½-5 hours the activities required of a sixth hand and the # 7 paper machine, the store room clerk and the quality control laboratory. Ms. Herbst even tested some of the equipment used by the sixth hand on the # 7 paper machine and had no trouble operation the equipment even though she is a small person. Based upon her evaluation of the plaintiff's medical restrictions and the job requirements, Ms. Herbst determined that the plaintiff could perform his old job as sixth hand on the # 7 paper machine. She also determined that the plaintiff could work as a store room clerk and had no difficulty performing the requirements of his current position as a quality control technician. Ms. Herbst also determined that the plaintiff could work in the wet lab gathering samples and he could work in the labor pool performing clean up duties.
The record shows that Mr. Eppinette was placed in a position at Riverwood as a quality control technician. The position is technically filled by Michael David Treno, the union president. Mr. Treno's absence to fulfill his union duties creates a temporary vacancy in the position. However, the job must be held for Mr. Treno should he decide to return, therefore, it technically cannot be given to the plaintiff on a permanent basis. The record also shows that Mr. Treno expects to remain union president until he retires at age 62, in approximately ten years. The record further shows that, in his current position, the plaintiff is making a much higher wage than he would be making in his former position on the paper machine.
Ernest Richard Moser, a Northeast Louisiana University professor with a Ph.D. in economics, testified regarding the possible amounts for lost future wages if Mr. Treno retires as union president at age sixty-two, the plaintiff is put out of his job at Riverwood at that time and obtains other employment at minimum wage. The factors considered by Mr. Moser in estimating a possible loss of future earnings by the plaintiff are highly speculative.
The trial court did not make an award for lost future earnings or loss of earning capacity. The jury awarded the *674 plaintiff $34,000.00 for this element of damages. Because we find that the plaintiff has failed to establish with sufficient specificity that he will suffer a loss of future earnings or lost earning capacity as a result of this injury, we find that the jury's award for this element of damages is manifestly erroneous and is reversed and vacated. The trial court's refusal to make an award is correct and is affirmed.

Loss of Consortium
A claim for loss of consortium is broken down into several components including loss of love and affection, society and companionship, sexual relations, the right of performance of material services, right of support, aid and assistance, and loss of felicity. Finley v. Bass, 478 So.2d 608 (La.App. 2d Cir.1985); Wilson v. National Union Fire Insurance Company, 27,702 (La.App.2d Cir. 12/6/95), 665 So.2d 1252; Evans v. Haynie, 26,135 (La.App.2d Cir. 9/21/94), 643 So.2d 273. Proof of any of these elements is sufficient for an award for loss of consortium. Caldwell v. Smith, supra.
Sherry Eppinette testified that at the time of trial, she and Mr. Eppinette had been married 14½ years and had two children, a 14 year old daughter and a 9 year old son. She stated that prior to the accident, she and her husband enjoyed an active lifestyle including skiing, baseball, volleyball, hunting, fishing and weight lifting. After the accident, they still fished together, but were not as physically active as they previously had been. As a consequence, they did not have as many friends as they did when they were both able to actively participate in sports. She stated that Mr. Eppinette's inability to work resulted in financial difficulties, necessitating the sale of their fishing boat and ultimately they had to move to another town to a house that was provided for them free of rent. Mrs. Eppinette stated that prior to the accident, she and her husband had experienced marital difficulties. The couple also had marital problems after the accident and Mr. Eppinette moved out for approximately one month in 1994. However, at the time of trial, Mrs. Eppinette stated that the situation had improved. Mrs. Eppinette's testimony shows that, due to her husband's injury, their lifestyle was negatively affected. The trial court awarded Mrs. Eppinette $12,500.00 for loss of consortium and the jury awarded her $10,000.00. We find that neither award is manifestly erroneous. However, due to the marital discord before and after this injury, we find that the jury's award of $10,000.00 for loss of consortium is the most reasonable. Accordingly, the trial court's award for loss of consortium is reversed and vacated and the jury's award is affirmed.

DECREE
For the reasons stated above, we render judgment in favor of the plaintiffs, Arlton Gregory Eppinette and Sherry Myers Eppinette against the City of Monroe, Phillips Contracting and its insurer, Liberty Mutual Insurance, in the following amounts:

Pain and suffering $ 35,000.00
Mental anguish 25,000.00
Lost past wages 123,831.28
Medical expenses 31,536.92
Loss of consortium 10,000.00
Total $225,368.20

The damages are assessed at 25% to the City of Monroe and 75% to Phillips Contracting. Costs in this court are assessed at 25% to the City of Monroe and 75% to Phillips Contracting. The amount of costs to be paid by the City of Monroe is $47.50.
AFFIRMED IN PART; REVERSED IN PART; VACATED IN PART AND RENDERED.
NORRIS, J., concurs in the result.
Before NORRIS, BROWN, WILLIAMS, GASKINS and CARAWAY, JJ.

ON REHEARING
PER CURIAM, on rehearing.
Rehearing Denied.
Costs in this court remain assessed as set forth in the original opinion. Costs in the trial court remain assessed as set forth in the trial court judgment.
NOTES
[1] The record does not reflect that the intervention by Riverwood for reimbursement of medical expenses and disability payments was ever addressed. There is no ruling on the intervention, no representative of Riverwood appeared at the trial and Riverwood has not filed a brief on appeal. Therefore, this issue is not properly before this court on appeal.
[2] The trial court incorrectly calculated the total amount of the damage award as $130,883.92.
[3] This result is indicated by writ grant language from the Louisiana Supreme Court in Reichert I and in Thornton v. Moran, 348 So.2d 79 (La. 1977).
[4] La. R.S. 38:2216(G) provides in pertinent part:

It is hereby declared that any provision contained in a public contract, other than a contract of insurance, providing for a hold harmless or indemnity agreement, or both,
(1) From the contractor to the public body for damages arising out of injuries or property damage to third parties caused by the negligence of the public body, it employees, or agents ... is contrary to the public policy of the state, and any and all such provisions in any and all contracts are null and void.
This provision invalidates any hold harmless or indemnity agreement between a contractor and a public body for damages arising from the negligence of the public body. Jenkins v. State, Department of Transportation and Development, 619 So.2d 1188 (La.App. 1st Cir.1993), modified on other grounds, 625 So.2d 1050 (La.1993); Jones v. Merrick Construction Company, 546 So.2d 928 (La.App. 3d Cir. 1989), writ denied (La. 1989).
[5] See and compare Caldwell v. Smith, 25956 (La.App.2d Cir. 8/17/94), 641 So.2d 1011, $35,000 award for a shoulder injury with no surgery; White v. Longanecker, 93-1122 (La.App. 1st Cir. 5/23/94), 637 So.2d 1213, writ denied 94-1704 (La. 10/7/94), 644 So.2d 640, $35,000 for shoulder injury requiring surgery and other injuries; Notto v. Brown, 525 So.2d 251 (La.App. 1st Cir. 1988), $68,697.74 for shoulder injury with surgery; Coutee v. State Farm Mutual Automobile Insurance Company, 95-269 (La.App. 3d Cir. 11/2/95), 664 So.2d 542, $14,000 for complete rotator cuff tear with no surgery and injury to a previous hip replacement; Thompson v. Louisiana Department of Transportation, 93-1294 (La. App. 3d Cir. 6/29/94), 639 So.2d 864, writ denied 94-2047 (La. 11/4/94), 644 So.2d 1052, $175,000 for severe rotator cuff tear with two surgeries and the possibility of a third where shoulder continues to dislocate; Petersen v. State Farm Automobile Insurance Company, 543 So.2d 109 (La.App. 3d Cir. 1989), $77,300 for general and special damages for rotator cuff impingement with ulnar nerve damage and TMJ; Ritchey v. Dees, 540 So.2d 1265 (La.App. 3d Cir. 1989), writ denied 542 So.2d 1387 (La. 1989), $15,000 for back injury with torn rotator cuff requiring surgery; Waterman v. Colonial Penn Insurance Company, 95-1578 (La.App. 4th Cir. 12/28/95), 666 So.2d 699, $42,500 for shoulder injury with surgery although rotator cuff tear was not found; Wood v. May, 94-0756 (La.App. 4th Cir. 12/15/94), 647 So.2d 1265, $138,000 for severe shoulder injury with disfigurement; Celestine v. United States Fidelity and Guaranty Company, 561 So.2d 986 (La.App. 4th Cir. 1990), $10,000 for strained neck and shoulder injury requiring surgery; Knower v. Peranio, 96-105 (La.App. 5th Cir. 7/1/96), 678 So.2d 574, writ denied 96-2004 (La.11/8/96), 683 So.2d 270, $125,000 for a severe rotator cuff tear and resulting disability; Sperandeo v. Denny's, Inc., 96-328 (La.App. 5th Cir. 10/1/96), 683 So.2d 743, $180,000 for back and shoulder injury, each requiring surgery.