STATE OF LOUISIANA

COURT OF APPEAL, THIRD CIRCUIT

05-1013

MEL MCDANIEL

VERSUS

CARENCRO LIONS CLUB, ET AL.

\*\*\*\*\*\*\*\*\*\*
APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. 974017
HONORABLE PATRICK LOUIS MICHOT, DISTRICT JUDGE
\*\*\*\*\*\*\*\*\*\*

GLENN B. GREMILLION
JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Marc T. Amy and Glenn B. Gremillion, Judges.

**Thibodeaux, Chief Judge, concurs and assigns written reasons.**

AFFIRMED IN PART, REVERSED IN PART, AND RENDERED.

John R. Shea
John Shea & Associates
400 E. Kaliste Saloom Rd., Suite #8200
Lafayette, LA 70508
(337) 981-7432
Counsel for Plaintiff/Appellant:
    Mel McDaniel

**E. Byrne Edwards**
**Nolan G. Edwards**
**Edwards Law Firm**
**P. O. Box 2970**
**Lafayette, LA 70502**
**(337) 237-6881**
**Counsel for Plaintiff/Appellant:**
    **Mel McDaniel**

**John S. Thibaut, Jr.**
**P. O. Box 36**
**Baton Rouge, LA 70821-0036**
**(225) 923-3200**
**Counsel for Secondary Defendants/Appellants:**
    **J G Enterprises, Inc.**
    **John Gullett**
    **Global Telemedia, Inc.**

**John W. Penny, Jr.**
**P. O. Box 2187**
**Lafayette, LA 70502-2187**
**(337) 231-1955**
**Counsel for Defendants/Appellants:**
    **Division of Arts & Culture**
    **Carencro Lions Club**
    **Lafayette City-Parish Consolidated Government**
    **Royal Insurance Company of America**

**George Armbruster, III**
**The Panagiotis Firm**
**1540 W. Pinhook Road**
**Lafayette, LA 70503**
**(337) 264-1516**
**Counsel for Secondary Defendants/Appellants:**
    **Lafayette City-Parish Consolidated Government**
    **Division of Arts & Culture**
    **Lafayette Consolidated Government**

GREMILLION, Judge.

In this case, the plaintiff, Mel McDaniel, appeals the judgments awarded to him in a bifurcated trial against the defendants, the Lafayette City Parish Consolidated Government (Lafayette), the Carencro Lions Club (Lions Club) and its insurer, Royal Insurance Company (Royal), and John Gullett d/b/a/ J.G. Enterprises, Inc. For the following reasons, we affirm in part, reverse in part, and render.

**FACTUAL AND PROCEDURAL BACKGROUND**

McDaniel, a country western singer who recorded several hit records including "Louisiana Saturday Night" and "Baby's Got Her Blue Jeans On," was injured when he fell approximately seven feet into an open orchestra pit while performing in November 1996, at the Heymann Performing Arts Center (Heymann Center) in Lafayette, Louisiana. The Heymann Center is owned by Lafayette and was leased to the Lions Club. Gullett, an event promoter, contracted with McDaniel on behalf of the Lions Club to perform for this event. In the lease agreement, the Lions Club is given the option of purchasing the use of an orchestra pit cover which is available only upon advanced request and the payment of $100. Neither the Lions Club nor Gullett requested the cover nor paid the $100 fee.

This case was first tried in June 2002. At the conclusion of McDaniel's case, the trial court granted the defendants' motion for directed verdict/involuntary dismissal, finding that McDaniel was solely at fault for the accident. McDaniel appealed, and we ordered a new trial. *See McDaniel v. Carencro Lions Club*, 02-1244 (La.App. 3 Cir. 3/12/03), 846 So.2d 837, *writs denied,* 03-1061, 03-1065, 03-

1

1069 (La. 6/27/03), 847 So.2d 1269. Lafayette, the Lions Club, and Royal applied for writs to the Louisiana Supreme Court, which were denied in June 2003.

Following a bifurcated four-day-trial in June 2004, in which the trial court considered the claims against Lafayette, the trial court attributed fault as follows:

| | |
|---|---|
| McDaniel | 75% |
| City Government | 15% |
| John Gullett | 8% |
| Lions Club | 2% |

It further awarded damages as follows:  past medical expenses, $87,589; future medical expenses, $0; past lost wages, $60,000; past pain, suffering, and disability, $100,000; future pain, suffering, and disability, $25,000, for a total of $272,589. The trial court ordered Lafayette/Royal to pay McDaniel $40,888.35.

The jury considered McDaniel's claims against the Lions Club and Gullett and apportioned fault as follows:

| | |
|---|---|
| City Government | 41.5% |
| Lions Club | 2% |
| John Gullett | 21% |
| McDaniel | 35.5% |

The jury awarded damages as follows:  pain, suffering and disability, physical and mental, and loss of enjoyment of life, past, $110,523 and future, $52,727; past medical expenses, $73,830; future medical expenses, $53,636; and, past lost wages,

2

$104,882 for a total of $395,598. The trial court ordered Lions Club/Royal to pay

McDaniel $7,911.96 and Gullett d/b/a J.G. Enterprises, Inc./Royal to pay $83,075.58.

The trial court signed a written judgment in September 2004. The

defendants filed a motion for JNOV or in the alternative, a motion for new trial in

November 2004, which was denied. McDaniel, the Lions Club, Lafayette, Royal, and

Gullett now appeal.

**ISSUES**

McDaniel assigns as error:

1.     The trial court and jury's assessment of fault as it should be found that Lafayette was 100% at fault or in the alternative, the jury's finding of fault was more reasonable than the trial court's assessment.

2.     The trial court and jury's damage assessment was inadequate or, in the alternative, the jury's assessment of damages is more reasonable than the trial court's assessment.

3.     The trial court's refusal to allow the testimony of his architectural expert in regard to the industry standards of orchestra pit covers and safety features, and whether the proffered testimony of the expert should be considered on appeal.

4.     The trial court's assessment of court costs, which should be assessed against the defendants.

5.     The trial court's award of expert fees to his architectural expert.

The Lions Club, Lafayette, and Royal assign as error:

1.     The jury and trial court's failure to assess McDaniel with 100% of the fault or, in the alternative, that the trial court's findings were more reasonable.

2.     Royal claims that the trial court erred in finding that Gullett was an "insured" under its policy when he was not an

3

active member of the Lions Club and was not acting in his capacity as an honorary member of the Lions Club.

3. The jury's award of damages was manifestly erroneous and the trial court's awards should be accepted.

Gullett assigns as error:

1. All of the errors assigned by Lafayette and the Lions Club but not Royal's assignment that he was not an insured under its policy.
2. The findings by the trial court and jury that he was at fault.

## LIABILITY

Lafayette, the Lions Club, Royal, and Gullett urge that McDaniel should be found 100% at fault, while McDaniel urges that Lafayette should have been found 100% at fault or, in the alternative, that the jury's findings of fault were more reasonable.

## STANDARD OF REVIEW

In this bifurcated case, the trial court determined the liability of Lafayette, while the jury determined the liability of the remaining defendants. However, in apportioning fault under the comparative fault system (in which the jury had to assign a percentage of fault to Lafayette), the jury and trial court came up with different fault percentages. In this instance, we must follow a special standard in reviewing these differing findings. Among the appellate courts and even within our own circuit, this standard of review is unsettled and confusing. The record in this case reveals that none of the lawyers nor the trial court had a clear understanding of the standard of review and that the "cases are very confusing in that area and there's no definitive answer." Additionally, as we shall discuss in further detail later, the supreme court has noted this problematic issue on several occasions, but has not yet addressed it.

4

Having reviewed our previous jurisprudence, along with that of courts of other circuits, we find it necessary to address the standard in our circuit at least as to the method of review. We do not reach the more problematic issue of harmonizing findings that do not equal 100%; nevertheless, we will attempt to clarify the standard of review on appeal as to fault apportionment and the review of damages. As we have noted in many of our opinions on this issue, the goal is to render a single harmonized decision with fault allocation among all parties equaling 100%. We feel it is imperative to review the history of the standard of review applied in cases of bifurcated trials.

In *Felice v. Valleylab*, *Inc.*, 520 So.2d 920, 924 (La.App. 3 Cir. 1987), *writ denied*, 522 So.2d 562, 563 (La.1988), this court stated that in bifurcated cases where there are conflicting findings of fact, the *manifest error standard does not apply* and the "court of appeal must decide which decision is more reasonable after a careful examination of the record." We went on to state that findings of fault are factual findings and that when there is no conflict between the judge and jury (there can be different findings and still not be a conflict), these findings are reviewable under the clear error standard. However, if the percentages are in conflict, they must be harmonized and the clear error standard is inapplicable to the assessment of percentages of fault. Additionally, if the assessment of damages are in conflict *the more reasonable award* must be chosen.

We went on to find that there were no conflicts in the findings of fact as to fault and that, after subjecting the findings to the clear error test, the trial court's finding passed, but the jury's finding was clearly wrong. We then assessed the state with 100% of the fault. We went on to find that the jury's damage award was the more reasonable one.

5

Judge Guidry concurred in the result, but expressed disagreement with the majority's conclusion that there was no conflict in the findings of fact as to fault. We agree. The trial court affixed fault to the State at 100% whereas the jury affixed the defendant, Valleylab, Inc., with 30% of the fault. As Judge Guidry pointed out, "This finding obviously fixes a 70% degree of fault attributable to others and, specifically, the State. In my view these findings on the issue of fault clearly conflict." *Id.* at 931. Later pronouncements that *as a matter of law* only a trial court can assess the fault of a public body do not change the fact that the percentages are in conflict.

Nearly seven years later, in *Hasha v. Calcasieu Parish Police Jury*, 94-705 (La.App. 3 Cir. 2/15/95), 651 So.2d 865, *writs denied*, 95-0667, 95-0676, (La. 4/28/95), 653 So.2d 592, an opinion written by now Justice Knoll, we reiterated that when conflicting findings of fact exist, a harmonized opinion should be rendered based on the record. We stated that in a bifurcated trial, when findings need to be harmonized, a manifest error review is inapplicable and that we must decide which decision is *more reasonable*. However, in dicta, we went on to extend the principle set forth in *Lemire v. NOPSI*, 458 So.2d 1308 (La.1984), that a jury's findings are inapplicable to the trial court in the reverse, i.e., that the trial court's findings as to fault apportionment pertaining to the non-public bodies are inapplicable, so that a jury's findings should be reviewed using the manifest error standard while disregarding the trial court's findings. We stated:

> Carrying this reasoning one step farther in the present case, the trial judge's consideration of the fault of Hasha and Duke, though sanctioned by *Lemire, supra*, was not binding on the jury and cannot conflict with the jury's adjudication of the fault of those parties. Thus,
>
> > It follows that since there is no conflict between the triers of fact, there is no need for the Court of Appeal to harmonize in accordance with the jurisprudence discussed

6

above. It also follows that in our appellate review of the facts found by the jury and the facts found by the trial judge the applicable rule will be the well established test of whether the trier of fact was clearly wrong.

*Hasha*, 651 So.2d at 869.

We then stated that we would apply the manifest error standard to the jury's findings regarding non-state defendants and the trial court's finding regarding the state defendants. Thus, although we dispensed with the manifest error review at the beginning of the opinion, it appears it was used anyway.

As to damages we stated:

[W]e find that the *assessment of damages* by the jury and the trial judgment are in conflict and must be harmonized. Accordingly, we will examine the record to inquire which damage award is the *more reasonable*.

*Id.* (citations omitted) (emphasis added).

In *Hasha*, the decedent, James Hasha was assessed 50% fault by the jury, which we found was not manifestly erroneous. However, we found it was manifest error for the jury to fail to find another party, Sylvia Duke, partially at fault and we assessed her with 25% of the fault. We went on to find that the trial court did not err in finding the defendant Police Jury 25% at fault. Because the damage awards were in conflict, we harmonized them by inquiring which one was more reasonable.[1] In *Hasha,* we separately reviewed the jury's findings as to the State using the manifest error standard and the jury's findings as to the non-public bodies using the manifest error standard. We again stated that there can be no conflict as a matter of law,

---

[1] Judge Thibodeaux noted many of these inconsistencies when he concurred in the result, stating, "The holdings in our circuit on the proper analytical tool to employ in reconciling conflicting verdicts in a bifurcated trial are inconsistent and confusing." *Hasha,* 651 So.2d at 878. He noted that the standard used to assess liability was the manifest error standard whereas as to the damages the standard used was the "more reasonable decision." *Id.* He further stated "the only practical and legally sound procedure susceptible of uniform application is a de novo review." *Id.* He also recognized that the court relied on cases that eschewed the manifest error standard used to assess liability but used it anyway. *Id.*

because the jury and trial court's finding are separately reviewed. Again, this ignores the problem of fault percentage assignments that do not equal 100% and the obvious conflict that still exists whether or not we proclaim as a matter of law that they do not.

In *Griffin v. International Insurance Co.,* 98-431 (La.App. 3 Cir. 10/7/98), 727 So.2d 485, 490, *writ denied,* 99-0854 (La. 5/7/99), 741 So.2d 656, we stated:

> [W]e must review each finding concerning the culpability of each party according to the manifest error standard of review. However, given that the findings of the jury and the trial judge concerning damages are in conflict, we will review the record and determine which award is the most reasonable.

After reviewing the 85% fault attributed to the State by the trial court, we found no manifest error. Additionally, we found no manifest error in the jury's finding of no fault on part of the plaintiffs. We then stated:

> Having found no manifest error in the decisions by the jury and the trial judge, we are presented with a conflict which requires us to harmonize these varying decisions by adopting the more reasonable decision. We find that the jury's decision that Abbeville is solely at fault is the more reasonable of the two.

*Id.* at 493. We further found that the jury's damage award was more reasonable.

In another opinion written that same year, *Edwards v. Daugherty*, 97-1542, pp. 18-19 (La.App. 3 Cir. 3/10/99), 729 So.2d 1112, 1124, quoting *Ourso v. Grimm*, 92-1274 (La.App. 3 Cir. 1/5/94), 630 So.2d 963, *writs denied*, 94-339 (La.3/25/94), 635 So.2d 231 and 94-346 (La.3/25/94), 635 So.2d 230, this court stated that when a judge and jury reach conflicting findings as to public and private defendants, "a JNOV is a proper means of reconciling the two verdicts." We again stated that there can be "no conflict between the findings of the jury and the trial judge because, as a matter of law, the jury has no right or duty to adjudicate the fault of the public defendant." *Id.* We then said:

8

The trial judge granted a JNOV in this case, adjusting the jury's quantum award; but he did not change the jury's fault assessment. The trial judge found the Sheriff 55% at fault for causing Jaymie's injuries; and, the jury assessed him only 32.5% fault in causing these injuries. *In reviewing the JNOV's quantum adjustments, we will apply the manifest error/abuse of discretion standard. However, we find the assessment of fault by the judge and jury remain[s] in conflict and must be harmonized. Accordingly, we will examine the record to decide which fault assessment is more reasonable.*

*Id.* at 1125 (emphasis added) (citations omitted). We found in *Edwards* that although the record supported the trial court and jury's apportionments, the trial court's fault assessment was more reasonable. We harmonized the verdict by amending it to reflect the trial court's percentage allocation. As for damages, we only reviewed the trial court's JNOV award of $800,000 for pain and suffering (the jury had allocated $0) using the standard set forth in *Coco v. Winston Industries, Inc.,* 341 So.2d 332 (La.1976).

In 2002, we again revisited the issue stating that we had settled upon a standard that "accords deference to the factual findings of the judge and jury and attempts to harmonize inconsistent results." *Davis v. Witt*, 01-894, pp. 13-14 (La.App. 3 Cir. 2002), 831 So.2d 1075, 1085, *reversed on other grounds*, 02-3102 (La. 7/2/03), 851 So.2d 1119. Moreover, we stated that:

[W]here there are inconsistent verdicts involving political subdivisions, there is no conflict between the jury and trial judge verdicts. The reason is that the jury is prohibited from determining the liability of the political subdivision in the first place.

. . .

Therefore, we will review the trial judge's findings of fault against [the political subdivision] under the manifest error-clearly wrong standard.

*Id.* at 1085; *see also Lemire*, 458 So.2d 1308.

Legal scholars have also commented on this problem as the supreme court noted in its *Davis* opinion in a footnote:

Commenting on this problem, MARAIST & LEMMON 1 LOUISIANA CIVIL LAW TREATISE: CIVIL PROCEDURE (1999) write:

> Just as the judge should be careful not to influence the jury's decision as to the private defendants, the judge should avoid being influenced by the jury as to his or her decision involving the public defendants. Whenever practical, while the jury is deliberating its decision as to the private defendants, the judge should place of record his or her allocation of fault as to the public defendants and the assessment of damages. *Id.,* § 11.13, n.9 at 313.

*Davis,* 851 So.2d at 1125, n. 11.

In our opinion in *Davis*, we then discussed the standard as follows:

> The approach adopted by . . . this court . . . requires an initial determination that a conflict exists between the trial court's finding and the jury's finding. In the present case, only the trial judge had the authority to make a determination as to fault and the apportionment thereof as well as the amount of damages to be awarded with respect to the Sheriff's Office. This court held in *Edwards v. Daugherty,* 97-1542 (La.App. 3 Cir. 3/10/99); 729 So.2d 1112, *writs denied*, 99-2034, 99-1393, 99-1484 (La. 9/17/99); 747 So.2d 568, 1105, that where there are inconsistent verdicts involving political subdivisions, there is no conflict between the jury and the trial judge verdicts. The reason is that the jury is prohibited from determining the liability of the political subdivision in the first place. Furthermore, this court in *Hasha* held that the "jury's allocation of fifty percent fault to the Police Jury" was not binding on the trial judge. However, the Sheriff's Office argues that the above rule announced in *Edwards* is "contrary to [s]upreme [c]ourt authority" [as expressed in *Lemire v. Nopsi*, 451 So.2d 1308 (La.1984)] and is in conflict with other circuits." *Hasha* explained that the method of having the jury allocate fault to a public defendant not subject to adjudication by a jury is authorized by the supreme court's decision in *Lemire* due to the procedural statute implementing a comparative fault scheme. The court in *Lemire* held that a jury's verdict against a public body "is not an advisory opinion in that it is not designed to advise, counsel, or compel the trial judge in its independent judicial obligation as regards plaintiff's claim against the public agency." *Lemire*, 458 So.2d at 1310. The supreme court in *Lemire* further noted that "La.[CodeCiv.]P. art. 1812 merely facilitates the court's confecting a judgment consistent with the jury determination relative to plaintiff's entitlement to his claim against the private defendant." *Id.* Thus, we find that *Lemire* supports the position that the judgment of the trial court and the jury in this case with respect to the Sheriff's Office are not inconsistent since the jury could not adjudicate the Sheriff's Office fault and *Lemire* clearly states that a jury's adjudication of issues involving a public agency are not to influence a trial judge's "independent judicial obligation" with respect to the public agency defendant. *Id.* Therefore, we will review the trial

judge's finding of fault against the Sheriff's Office under the manifest error-clearly wrong, standard of review.

*Davis,* 831 So.2d at 1084-1085. We found that there was no manifest error in the trial court's apportionment of 20% fault to the Sheriff's Office. Pertaining to damages, the trial court did not increase the jury's award of wrongful death damages in the amount of $200,000 for each of the ten children. Using the *Coco* standard, we found that award abusively low and awarded $400,000 to each of the ten children. The supreme court reversed the trial court's finding of 20% liability against the Sheriff and stated:

> Although the verdicts of these two triers of fact appear diametrically opposed, that fact alone does not call into play the body of conflicting appellate jurisprudence regarding the proper standard of review in such cases. If the respective contradictory verdicts *individually survive a review for error*, then the troubling issue of harmonizing the verdicts comes into play and must be resolved.
>
> *Our first duty is the determination of whether the findings of fault made by the trial judge and jury are reasonable and not manifestly erroneous.* In finding the trial judge's adjudication of liability on the part of the Sheriff's Office clearly wrong, we do not reach the question of how a reviewing court must resolve conflicting verdicts in bifurcated trials, or what is called harmonizing the verdicts.

*Davis*, 851 So.2d at 1126 (citations omitted) (emphasis added). A footnote followed this passage which states:

> We are keenly aware that the various courts of appeal have adopted different procedures to reconcile conflicting decisions of the jury and judge in bifurcated trials. Although we do not reach the question of how to reconcile conflicting decisions, we do comment, as we did once before in *Powell*, 695 So.2d at 1329, that dicta in *Lemire v. New Orleans Pub. Serv., Inc.*, 458 So.2d 1308 (La.1984), regarding the use of JNOV to reconcile such inconsistencies is not workable. Our decision in *Powell*, 695 So.2d at 1329 illustrates that where reasonable minds could differ with respect to the evidence JNOV could not be used as a procedural tool to reconcile conflicting decisions. This is clearly not the function of a JNOV.

*Id.* at n.14.

In *Davis*, the Louisiana Supreme Court noted the inconsistencies among the courts of appeal and the difficulty in setting the standard in bifurcated trials, but did not address the issue. It stated in a footnote:

> The question of the trial judge's independent determination of the liability of the public entity before it has been troublesome and the impact of jury interrogatories relative to public entities has elicited our attention.

*Id*. at 1125, n.11.

Later, in another footnote, the supreme court stated:

> The issue of harmonizing the jury verdict also formed part of our consideration for granting the writ applications, but because of our disposition of the duty issue we do not reach this problematic issue.

*Id.* at 1126, n.12.

Since *Davis*, the second circuit has addressed the issue in *Hays v. State of Louisiana*, 37,229 (La.App. 2 Cir. 9/24/03), 856 So.2d 64, *writs denied,* 03-3187, 03-3218 (La. 2/6/04), 865 So.2d 726, 729. In *Hays*, the trial court determined the liability of the Town of Grambling, while the jury determined the liability of two other defendants. The *Hays* court seems to have rejected the notion that there can be no conflict as a matter of law and instead adopted this standard:

> [A]n intermediate appellate court, in bifurcated case, is required to reconcile or resolve any differences in the factual findings between the trial judge and the jury by determining which witnesses are more credible, to ascertain which of the triers of fact accorded a more reasonable measurement to the evidence in reaching a decision, and to decide which of the said triers of fact gave a more reasonable evaluation and drew a more reasonable inference from the facts, in order to harmonize the judgments. *Said another way, after concluding that a conflict exists, there must then be a determination that the findings of fault and apportionment and the award of damages were reasonable and not manifestly erroneous. In the event that the finding by one fact finder is manifestly erroneous and the other is not, then the manifestly erroneous determination is discarded and the finding which is not manifestly erroneous will stand.*

*Finally, if conflicting findings are not manifestly erroneous, then the court must, after a careful review of the entire record, examine each inconsistent reasonable finding to determine which fact finder's finding is more reasonable.*

*Id.* at 71 (*quoting Eppinette v. City of Monroe*, 29,366 (La.App. 2 Cir. 6/20/97), 698 So.2d 658 (citations omitted) (emphasis added).

In *Hays,* the trial court adopted the percentage fault assigned by the jury, which the court of appeal found was not clearly wrong. However, the trial court and jury made vastly different monetary awards, which the court of appeal found to be in conflict. In reviewing the jury's findings, the court of appeal found that it committed manifest error, but that the trial court had not. It then used the much discretion standard in reviewing the damage award made by the trial court, but went on to find:

> Based on the foregoing, we find that the jury's award of $145,000 in property damages and no general damages is manifestly erroneous. The trial judge's award of $10,000 in general damages and no property damages is supported by the record and is not manifestly erroneous. Therefore, pursuant to *Eppinette*, supra, we discard the jury's manifestly erroneous determination and affirm the trial judge's award. Applying the percentages of fault found by both the jury and the judge, general damages of $4,400 are assessed against GSU and $5,600 against the Town.

*Hays*, 856 So.2d at 73. Hays also recognized the supreme court's ruling that a JNOV is an improper tool to reconcile conflicting decisions where reasonable minds could differ with respect to the evidence.

Black's Law Dictionary defines "harmony" as "Agreement or accord; conformity." BLACK'S LAW DICTIONARY 734 (8th ed. 2004). Merriam-Webster's defines "harmonize" as "to bring into consonance or accord." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 569 (11 ED. 2003). In our opinion, this requires one judgment assessing fault percentages to all of the defendants that total 100%. Having reviewed all of the conflicting jurisprudence, we feel it is error to claim that a conflict cannot exist as a matter of law. While it is true, pursuant to *Lemire,* that only the trial

13

court is able to adjudicate the fault of a state defendant, that does not mean that a conflict will not exist based on the jury's fault attribution to the remaining parties. Moreover, we think it is error to extend that principle of law in the reverse, i.e., that the jury's findings as to the remaining defendants should be reviewed in a vacuum without consideration of the fault percentage the trial court has necessarily attributed to it. For the most part, we feel that the appellate court in *Hays* set forth a workable standard. Accordingly, when there is a difference between the findings of the trial court and the jury in a bifurcated trial, we suggest that a review of the findings of fault and damages should be conducted in this manner:

1) The first step in our review should be to consider the trial court's finding of fault as to the public defendant under the manifest error standard. If the trial court's findings are not manifestly erroneous, then the trial court's determinations should be adopted by the appellate court without consideration of the jury's findings. However, if we find that the trial court's finding of fault are manifestly erroneous, we must assign fault. In this regard we are not constrained by the jury's findings. We would simply conduct a de novo review as we would in any case when we determine the finder of fact committed manifest error.

2) In deciding the remaining conflicting findings of fault as to the other defendants, we should again review both the trial court and jury's findings using the manifest error standard. If neither is manifestly erroneous, we should then choose the one we find more reasonable.

3) If one is manifestly erroneous, but the other is not, we should adopt the latter. In the case where those findings do not equal 100%, we will be required to harmonize the verdicts which may require adjusting the percentage of fault assigned to the non-public parties. We should not be constrained to a mathematical calculation, but should be allowed to render based on our review of the record. If we find both verdicts are manifestly erroneous, we will be required to do a de novo review based on the record.

4) When we review damages, if we determine neither the trial court nor the jury abused its discretion in awarding general damages and was not manifestly erroneous in awarding special damages, we should be allowed to determine which

14

verdict is more reasonable and make that our ruling. Should we find one to have abused its discretion or been manifestly erroneous, we should simply adopt the ruling we find that is not. If we find both abused their discretion or were manifestly erroneous either in their entirety or to an individual plaintiff or item of damages, we should then conduct a de novo review constrained by the rule of law set forth in *Coco v. Winston*, 341 So.2d 332 (La.1976).

## LIABILITY

Lafayette urges that McDaniel should be 100% at fault, while McDaniel urges that Lafayette should have been found 100% at fault. Louisiana Civil Code Article 2317 provides in relevant part:

We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things, which we have in our custody. This, however, is to be understood with the following modifications.

With respect to Lafayette's liability, La.R.S. 9:2800 provides in relevant part:

Limitation of liability for public bodies

A. A public entity is responsible under Civil Code Article 2317 for damages caused by the condition of buildings within its care and custody.

C. Except as provided for in Subsections A and B of this Section, no person shall have a cause of action based solely upon liability imposed under Civil Code Article 2317 against a public entity for damages caused by the condition of things within its care and custody unless the public entity had actual or constructive notice of the particular vice or defect which caused the damage prior to the occurrence, and the public entity has had a reasonable opportunity to remedy the defect and has failed to do so.

Accordingly, McDaniel had to show that the orchestra pit was in the care, custody, and control of Lafayette; the orchestra pit had a vice or defect which created an unreasonable risk of harm; and that his injury resulted from the defect. Additionally, McDaniel needed to prove that Lafayette had actual or constructive notice of the dangerous condition. As we discussed extensively in *McDaniel I,* there is no question that Lafayette had care, custody, and control of the orchestra pit. It is also undeniable

15

that Lafayette had notice of the condition as discussed below. The central question is whether Lafayette's policy of leaving the orchestra pit uncovered created an unreasonable risk of harm. In order to decide what constitutes an unreasonable risk of harm, the factfinder must weigh the social utility of the thing versus the likelihood and severity of harm. *Clark v. Hartford Accident & Indem. Co.,* 562 So.2d 50 (La.App. 3 Cir. 1990). Whether or not the defect posed an unreasonable risk of harm must be decided on the particular facts and circumstances of the case. *Id.* The plaintiff bears the burden of proving by a preponderance of the evidence that the State was at fault. *Id.* The trial court found that the open orchestra pit presented an unreasonable risk of harm, assigning to Lafayette 15% of the liability. The following evidence was adduced at trial.

McDaniel testified that he had never previously performed at the Heymann Center. He stated that he did not attend the sound check earlier in the day because his crew knows what he expects and takes care of it for him. He said the first time he had ever been on the stage was that evening when the show began at 9 pm. He stated that there was one spotlight on him the entire time he performed. He recalled stating two times, as was evidenced in the video of the performance, that he could not see the crowd. He then asked for the lights to be turned up so he could see the crowd. Some technical problems ensued with the sound equipment, so McDaniel decided to hand out guitar picks and bandanas to the crowd. McDaniel stated that as he was walking forward to the crowd that he did not know what had happened, but he felt his "shoulder go back," and he tasted blood in his mouth. A video tape was made of the performance and it clearly shows McDaniel walking toward the crowd and unexpectedly falling into the uncovered orchestra pit. He stated that he did not

16

see white tape on the edge of the stage nor did he see bundled up microphone cables. He testified that he was looking at the crowd.

Patrick Roy testified that he was employed by the City of Lafayette from 1988 to 2001. He stated that at the time of the accident, he was the safety supervisor for the city and that his job entailed creating, implementing, and monitoring safety programs for city employees. Mr. Roy was presented with a document he wrote on August 21, 1989, to the manager of the Heymann Center, Frank Bradshaw. It stated:

> Prior to renovation and reopening of Heymann Center in January 1989, there have been four accidents with individuals falling into orchestra pit. One was a private citizen, and this accident resulted in death of individual. The other three accidents involved City employees — one of which turned into a workman's comp case, and the other two being somewhat minor in nature.
>
> Since the auditorium reopening at beginning of 1989, there have been two separate cases of individuals falling into orchestra pit. Both cases involved private citizens, a nine-year-old boy and a twenty-year-old girl. Individuals' injuries were injured right forearm and sprained left wrist. Both of these cases have been closed.
>
> From the auditorium's very beginning in 1960 until now, there has never been a reported injury of any member of a professional performing or theatrical group falling into orchestra pit. One would, therefore, begin to conclude that the professional entertainer is always conscious of where the edge of a stage is and always aware of an existing orchestra pit.
>
> But since the auditorium in Lafayette is also used by local people for such things as dance reviews, Mardi Gras pageants, etc., what can we do to reduce our liabilities with the non-professional using the stage area?
>
> Referring to the attached photographs, areas of concern are top three stairs leading onto stage and the edge of the stage itself. A fall from these areas is about a seven-foot drop to the bottom of the orchestra pit. In the front of the orchestra pit is a short wall, or "people barrier". Quite obviously, a rail protector or barrier can't be installed on pit side of top stair steps, nor on stage edge because of obstruction of audience viewing.
>
> The following choices offered for your consideration when orchestra pit is not being used, maintain a safety factor consistency but vary in extremes of aesthetic values:

17

Choice # 1–Plain and simple catch netting attached to hooks mounted along inside periphery of orchestra pit. Netting is of type used in aerial performances such as high wire walking and trapeze acts.

Advantage–Economical

Disadvantage–Negative aesthetic value.

Choice # 2–Placement of large Styrofoam filled bags on orchestra pit bottom. These are type of bags utilized in catch pits for pole vaulters and high jumpers in field-track events.

Advantage–Economical

Disadvantage–Zero aesthetic value.

Choice # 3–Placement of sectional, portable, flooring onto portable support structure similar to scaffolding. Height of portable floor top in orchestra pit could be designed to be slightly less than top of "people barrier" in front of orchestra pit.

Advantage–Lessened erosion of aesthetic value of auditorium stage area.

Disadvantage–Considerable time and labor expenses incurred during set-up and take-down of portable, elevated pit flooring and portable support structures.

Choice # 4–Permanent installation of hydraulic operated orchestra pit floor which could be brought to desired floor height by energizing an automated system.

Advantage–Total aesthetic enhancement of auditorium stage area, the increased achievement of theatrical effectualness, additional positive selling feature when attempting to attract national and international theatrical groups.

Disadvantage–Cost

Again, Frank, we are emphasizing the local, non-professional performer using the stage and ascending to/descending from stage that we must protect. For instance, had the local nine-year-old boy, as described earlier, experienced permanent disability or even death from the fall into the pit. . . . .can you imagine the financial cost to the City!! You have a tough call to make. I, personally, would recommend Choice # 4–hydraulic operated floor. As you described to me, the room for

18

control panel, pre-run conduit and anticipated electrical circuits in main distribution panel were all done back during the initial design and construction of the auditorium. Some person or some group of people had vision back "when" and planned for the day when a raise-lower orchestra pit floor would be installed.

Roy testified that the city eventually decided to go with choice number three, a portable platform. Roy testified that his primary concern was for the non-professional performer. He also stated that he would prefer that the pit be covered when it is not in use and there is a performance on stage. He further testified that the last time a person fell (before McDaniel) the cover was available, but not in use at the performer's request. He further stated that, other than one death from falling, all of the other injuries were minor.

Bradshaw testified that he has been employed by the Lafayette Consolidated Government for more than thirty years and was the manager of the Division of Arts and Culture. He testified that his job was to oversee the Heymann Center. Bradshaw reviewed the Heymann Center's eight-page lease agreement that was signed by himself and Gullett, the promoter of the event. In paragraph six of the lease, which was submitted into evidence, entitled "Fees and Payments," it states "ORCHESTRA PIT COVER available upon advance request at $100.00." Bradshaw testified that an advance request must be made for the cover and the $100 fee must be paid.

Bradshaw went on to testify that since Roy's 1989 memorandum there had been two more incidents of people falling into the orchestra pit, for a total of eight accidents. Bradshaw then discussed a 1991 document he authored outlining the Heymann Center's "wish list" of five major capital projects within the next five years, one of which was an orchestra lift. That portion of the document states:

19

ORCHESTRA LIFT

This proposition was in the original 1988-1989 renovation project as an add-alternate; but, it was not accepted. The facility's user groups still fee[l] the installation of an orchestra lift will make the HPACC multi-functional by:

* Providing an extension or cover over the orchestra pit. Virtually every act that has played this house since it reopened has requested a pit cover or extension in order to play the audience more intimately.

*Providing additional seating in the pit. Depending on the act and the arrangements. 75 more seats could be added; thus, making the building more attractive and marketable to promoters.

* Properly framing the orchestra when in the pit by elevating the floor when needed, coupled with a modification of the pit, necessitated by the lift installation, the orchestra could perform its function without the feeling of "playing in a hole".

Another feature this cover/lift could provide to the complex is to cover the orchestra pit when not needed. This would be a tremendous safety feature for the building as pointed out in a recent Risk Management inspection report. (Risk Management Safety Audit attached).

For more detail, I have attached the scope of work detail with cost estimations as prepared by Wayne Corne of Corne, Sellers and Associates.

ESTIMATED COST: $434,815.00

Bradshaw testified that the orchestra pit cover was built in October 1989, for the Wayne Newton concert, at his request. Bradshaw then reviewed McDaniel's rider, which did not request the orchestra pit cover. Bradshaw stated that had it been requested, the pit cover would have been put in place. He further stated that the same system was in use at trial (prior request for it to be used). Bradshaw testified that the $100 was to recoup some of the cost of having the four to six employees put the cover

20

in place, which usually took two to three hours. He further stated that most non-professional groups want the cover on whereas the professional groups prefer that it be left off. However, he was then presented with his own document stating that "virtually every act that has played at the house since it reopened has requested a pit cover." Bradshaw also testified that there had previously been some footlights at the edge of the stage, but they were taken out in 1989, in order to modernize the theater. When questioned as to why the Heymann Center does not just leave the cover on all the time and remove it if requested, Bradshaw stated that it was the normal procedure, followed in the industry.

Bradshaw further testified that the Heymann Center was available all day the night of McDaniel's performance, so that he and his crew could perform sound checks and familiarize themselves with the stage and their surroundings. Bradshaw testified that fifty percent of the people want the cover on and fifty percent do not. The defendants questioned whether it would be any different (financially) to have a policy of leaving it on and charging $100 to take it off. Bradshaw testified that it was not the norm in the industry at the time, but financially they could recoup the same based on the 50/50 scenario described above.

Michael Schnauder, the sound engineer at the Heymann Center and the acting stage manager the night of McDaniel's performance, testified that there were no lights shining into the orchestra pit nor were there any inside of it. He said that the houselights (lighting above the crowd) were brought up after McDaniel stated that he could not see the audience. Schnauder further testified that he had put the white gaff tape down on the edge of the stage before the orchestra pit earlier in the afternoon and that the tape was not reflective and did not glow in the dark. However, he stated that it was the standard tape used in the industry. Schnauder testified that he thought it

21

was unusual that McDaniel did not show up for the sound check and that he had never seen a performer not show up before. He further testified that the advantage of attending a sound check is because of unique building characteristics affecting acoustics, amount of reverb, and the way sound travels, and to know where everything is located such as the restroom, dressing room, and green room. He also agreed that it offers the musician the opportunity to view the parameters of his playing surface. However, he admitted the main reason for a sound check is to check the sound and tweak the sound for the performance.

Murray Conque, the comedian who performed before McDaniel, testified that he always attends sound checks. He stated that he noticed the orchestra pit and the white tape. He further testified that on the night he performed he was also under the spotlight, but because he had pre-established his boundaries by attending the sound check, he knew not to go beyond the monitors he had placed on the stage. However, he testified that he has performed at the Heymann Center numerous times and was familiar with the orchestra pit. He also testified that some headlining performers go out for a sound check, but others do not. He stated that it was not unusual for the headlining performer to not attend the sound check.

Fabian Patin, a forensic architect, testified that the orchestra pit was six feet four inches deep from the end of the stage and that the flooring was made of concrete. He stated that he felt that the lights, used at the time of McDaniel's fall, did not properly illuminate the pit. He further testified that the white tape at the edge of the stage was inadequate to warn of a six-and-a-half-foot drop to the floor. After elaborating on numerous tests done of the tape, he also said that he did not think McDaniel could see the tape due to the bright spotlight that was focused on him. He further stated that there was white tape scattered about the stage to denote several

22

things and that it would not necessarily have been an indicator that a hazard existed. He testified that if there is a hazard, the standard in the industry is to use yellow chevron tape, which is wider than the white gaff tape. Patin opined that the orchestra pit should have been covered at all times when not in use. He testified that there is no reason for it to be uncovered when an orchestra is not playing. He stated that there are very few events that need an open pit, and that a no-expense simple solution would have been to keep the cover on. He also stated that he did not think McDaniel would have fallen if the foot lights were still on the edge of the stage. Patin testified that he was paid $35,253.10 for his work over the course of the litigation.

**Expert Testimony**

First, we will address McDaniel's third assignment of error as it bears on the issue of liability. McDaniel argues that the trial court erred in refusing to allow Patin's testimony regarding the industry standard pertaining to orchestra pit covers. Patin would have testified that seventeen theaters were surveyed by his employees and that 94% kept the orchestra pit covered when not in use. He would have said that the one theater that did not keep it covered had lighting going all the way around the pit. The defendants objected to the testimony as double hearsay in that Patin himself did not make the phone calls, there was no record of whom his employees spoke to at the various locations, there was no information pertaining to the time frame (i.e., were covers in place at the time the call was placed versus the time of the accident), and that the survey/study was incomplete in that it only included those facilities that responded.

McDaniel relies on our previous opinion in which we held that "prohibiting Mr. McDaniel from presenting the testimony of Fabian Patin with regard to the industry standard was clear error, as discussed below." *McDaniel I*, 846 So.2d at 848. In *McDaniel I*, we were referring to Patin's testimony regarding lighting and

23

architectural conditions. In reviewing the exclusion of expert testimony by the trial court, we will only reverse if the trial court was clearly erroneous. *Darbonne v. Wal-Mart Stores, Inc.,* 00-551 (La.App. 3 Cir. 11/2/00), 774 So.2d 1022. Pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc,* 509 U.S. 579, 113 S.Ct. 2786 (1993), the trial court must determine if the expert's testimony is both reliable and relevant. It has wide discretion in this regard as a gatekeeper of reliable and relevant evidence. *Darbonne,* 774 So.2d 1022. In this instance, there is no doubt that the testimony regarding the industry standards pertaining to orchestra pits would have been highly relevant. The problem lies in the reliability of the method used by Patin and his employees in gathering the information.

We agree with McDaniel that Patin's testimony should have been allowed and that it was clear error for the trial court to exclude it. The unreliability of the method used to accumulate the statistics could have easily been exposed on cross-examination. In *Rowe v. State Farm Mutual Automobile Insurance Co.,* 95-669, p. 17 (La.App. 3 Cir. 3/6/96), 670 So.2d 718, 728-29, *writ denied,* 96-0824 (La. 5/17/96), 673 So.2d 611, we stated:

> As a general rule, the factual basis of an expert's opinion goes to the credibility of the testimony, not its admissibility, and it is up to the opposing party to examine the factual basis of the opinion in cross-examination. *Loudermill v. Dow Chemical Co.,* 863 F.2d 566 (8th Cir. 1988). To be reliable, such testimony requires more than "subjective belief or unsupported speculation[.]

In *Daubert,* 509 U.S. at 596, 113 S.Ct. at 2798, the Supreme Court stated that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Further, appellate courts in this state have held that a testifying expert need not be the one who compiled the statistics or data; he may rely on data prepared by others. *See Barre v. Bonds,* 99-1806 (La.App. 4 Cir.

24

5/10/00), 763 So.2d 60. Additionally, we have held that the method of testing or information collection should be considered by the jury in assessing what weight to give to the expert's conclusion. *See State v. Brossette*, 634 So.2d 1309 (La.App. 3 Cir. 3/2/94), *writ denied,* 94-0802 (La. 6/24/94), 640 So.2d 344.

In this instance, Patin's opinions as to industry standards based on his casual survey should have been put before the jury. Defense counsel was free to cross-examine Patin as to the methods used to collect the information. We feel that a jury in this day and age is savvy enough to determine the value and weight to be given to the study.

Because we have found it was error to exclude the testimony, we will consider the proffered testimony in our review. Having reviewed it, we do not attribute great weight to it due to the aforementioned defects in the methods used to collect the information. Accordingly, although it was error to exclude the testimony, we find that it was harmless based on our review of the entire record.

### Liability of Lafayette City Parish Government

We begin our review by considering the trial court's findings as to the fault of Lafayette using the manifest error standard of review. Initially, we agree with the trial court that the open orchestra pit created an unreasonable risk of harm. However, we feel that the trial court manifestly erred in assigning only 15% liability to Lafayette. In assessing fault, the trial court stated:

> Lafayette . . . was in a superior position as owner and garde holder to know about the prior accidents and the dangers of the open pit. When the design was changed and they eliminated the orchestra hydraulic lift, they had already eliminated the foot lights because of the lift. But when the lift was taken out, they didn't put the foot lights back in. And they didn't really have anything really adequate to mark the edge after that. They had to use tape.
>
> Concerning the contract, they put the default position as leaving the cover off instead of on. They never addressed whether the cover was

25

on or off as a safety issue, but just simply as another contractual matter along with securities, in the same paragraph as security and parking and those types of matters. So it didn't really alert the other person entering into the contract with them and they were in a superior position about the danger and what prior actions you might want to do it that way or reverse the default position.

While we agree with these findings of the trial court, we feel that Lafayette, of all the parties concerned, bears the brunt of the responsibility for this accident. There is no doubt that the open orchestra pit was a hazard. Considering that nine people had fallen into it, whether professional performers or not, the city could have easily instituted the no-cost measure of leaving the cover on at all times and requiring payment to remove it. Even assuming the industry standard was to leave it off, based on the history of accidents at the Heymann Center, including one death, Lafayette, at the very least, could have made a more prominent offer to put the cover over the pit for the $100 fee. However, since the risk had been recognized and discussed by Lafayette, it should have considered reversing the policy of leaving the cover on unless the $100 fee was paid to remove it, which would have resulted in no revenue loss to the city. Accordingly, we find that the trial court was manifestly erroneous in assigning only 15% fault to Lafayette.

Although we do not compare the jury's percentage finding as to Lafayette because only the trial court is in the position to adjudicate liability against it, we will still consider the jury's percentage finding as to Lafayette in making our own determination. We do that because we feel that any factfinder's determinations, because of their superior position in seeing live testimony and being able to make credibility calls, even if not *legally* allowed to decide the fault of a public body, should not be abandoned as useless. But we note, as we pointed out in our suggested analysis, that we are not constrained by the jury's findings. The jury surely felt that Lafayette should bear a rather large percentage of the fault as it assigned it with 41.5%

26

fault. With that in mind, we conclude after our de novo review of all the facts and for the reasons set forth above that Lafayette should bear 65% of the fault for this accident.

### *Liability of John Gullett*

Although we have found that the trial court was manifestly erroneous in its findings relative to Lafayette, we shall still review its findings of fault as well as the jury's finding of fault relative to the other parties using the manifest error standard of review. The trial court assigned Gullett with 8% of the liability while the jury assigned him 21%. In reviewing the record, we find neither of these manifestly erroneous. As the trial court pointed out, Gullett's contract between himself and McDaniel should have included the option of the pit cover, but it did not. In his business as a paid promoter, it is incumbent upon him to make sure that the performers he contracts with to perform at various locations are aware of their options. Because we have determined that Lafayette should bear the largest portion of fault, we believe that the jury was more reasonable in assigning Gullett with 8% liability and adopt that as our verdict.

### *Liability of the Lions Club/Royal*

Both the trial court and jury found the Lions Club 2% at fault. We find no manifest error in that determination. Although the Lions Club is in the business of fundraising for worthy causes, it must be cognizant of the contracts it enters into. The contract between it and the Heymann Center listed the orchestra pit cover as an option. However, the Lions Club hired Gullett to handle virtually every aspect of the production. Accordingly, we agree that the Lions Club's fault in this matter is negligible. Thus, we affirm the finding of 2% liability against the Lions Club.

27

### Mel McDaniel

The trial court found McDaniel 75% at fault, while the jury found him 35.5% at fault. Simply, if McDaniel had attended the sound check, the injury may have been avoided if he had noticed the open orchestra pit. Nevertheless, there was testimony that people who were aware that the pit cover was off, still fell into it. But, because McDaniel is a professional performer, he should have been aware of the possibility that an open orchestra pit was in front of him. However, we feel that it was manifest error for the trial court to assign him 75% of the fault. McDaniel understandably had his attention on the audience and, in an attempt to continue to entertain them even when his equipment was malfunctioning, he sought personal contact with them. We have considered the jury's allocation of 35.5% fault under the manifest error standard of review and find that it is not clearly wrong. However, at this point in our analysis, the highest possible fault that we can assign McDaniel is 25%, and we do this in the spirit of harmonizing the verdict and finding an "accord" or "conformity" in order to achieve a 100% judgment. Therefore, McDaniel is assessed with 25% of the liability.

### Harmonizing the Percentages

We first note that the trial court's method of "harmonizing" the percentages of liability was to use its own figure of liability as to Lafayette and the jury's as to the Lions Club and Gullett, for a total of 38% liability. This method, in effect, left McDaniel bearing 62% of the liability when the trial court found him 75% liable and the jury found him 41.5% liable. One can see how this method could easily lead to discrepancies that cannot so easily be overlooked as it could in this case (for example, if the three defendants' liability equaled more than 100%). Clearly, the supreme court has stated that a JNOV is not the proper avenue to harmonize the

verdict. *See Davis,* 851 So.2d 1119. Fortunately, we need not address that issue here, i.e., the trial court's method of harmonization, nor do we face the situation of harmonizing inconsistent percentages on appeal. As we have previously stated, we feel that a de novo review, as has been adopted by some of our colleagues, disregards the entire factfinding process that the jury and trial court have been asked to conduct. Accordingly, we prefer the method of reviewing findings for manifest error and if none is found, choosing the more reasonable one. The resulting percentages of liability after concluding that review equal 100% and are as follows[2]:

| | |
|---|---|
| Lafayette | 65 % |
| Gullett | 8% |
| Lions Club | 2% |
| McDaniel | 25% |
| Total: | 100% |

As we have concluded, Lafayette should bear the greatest amount of fault, but McDaniel is not without fault. We have found that the trial court was manifestly erroneous in setting fault too low and in only considering the jury's finding relative to Lafayette because it found a significant amount of fault attributable to Lafayette. There was no manifest error attributed to either Gullett or the Lions Club, allowing us to choose the more reasonable allocation of fault. Gullett was a minor player, and we hold that the lower allocation is more reasonable. That leaves only McDaniel who must bear some responsibility for his own injury and, quite frankly, in order that the verdict equal 100%, we choose the high side of high fault at 25%. We note that if we were not bound to find McDaniel 25% at fault and should we believe that 25% was

---

[2] We note that we leave the issue of harmonizing percentages that do not equal 100% for another time.

either too high or too low, we would have had to harmonize the verdict to equal 100%. Other than a mathematical conclusion, we offer no other means to satisfy such a riddle.

## INSURANCE COVERAGE

Following the trial, McDaniel filed a Motion to Determine Insurance Coverage of Defendant, John Gullett, urging that he was an insured under the Lions Club's Royal policy. Gullett also filed a Memorandum in Support of Insurance Coverage. Royal filed an Opposition to Motion for Insurance Coverage. In the final judgment, the trial court stated that "IT IS FURTHER, ORDERED, ADJUDGED AND DECREED that the defendant, John Gullett, d/b/a J.G. Enterprises, Inc., is insured under the defendant, Royal Insurance Company of America's Insurance policy," without providing reasons. Gullett and Royal were cast in solido for $83,075.58.

The parties' intent, as reflected by the words of the policy, determine the extent of coverage. La.Civ.Code art. 2045. When the words of a contract are clear, explicit, and lead to no absurd consequences, the contract must be interpreted within its "four corners" and cannot be explained or contradicted by parol evidence. La.Civ.Code art. 1848; *Peterson v. Schimek*, 98-1712 (La. 3/2/99), 729 So.2d 1024. An insurance policy should not be interpreted in an unreasonable or a strained manner so as to enlarge or restrict its provisions beyond what is reasonably contemplated by its terms or so as to achieve an absurd conclusion. *Reynolds v. Select Props., Ltd.,* 93-1480 (La. 4/11/94), 634 So.2d 1180. Subject to the above rules of interpretation, insurance companies have the right to limit coverage in any manner they desire, so long as the limitations do not conflict with statutory provisions or public policy. The pertinent part of the policy reads as follows (emphasis added):

A.  THE NAMED INSURED AS SHOWN ON THE DECLARATIONS SHALL READ AS FOLLOWS:

30

THE INTERNATIONAL ASSOCIATION OF LIONS CLUBS, ALL DISTRICTS (MULTIPLE, SUB AND SINGLE) OF SAID ASSOCIATION, ALL INDIVIDUAL LIONS CLUBS ORGANIZED OR CHARTERED BY SAID ASSOCIATION, LEO CLUBS, LIONESS CLUBS AND ANY OTHER LION ORGANIZATION OWNED, CONTROLLED OR OPERATED BY A NAMED INSURED OR BY INDIVIDUAL LION MEMBERS WHILE ACTING ON BEHALF OF A NAMED INSURED.

. . . .

B.    AS RESPECTS COMMERCIAL GENERAL LIABILITY INSURANCE, BUT NOT HIRED AND NON-OWNED AUTO LIABILITY INSURANCE:

1) THE QUALIFIED WORD "INSURED" INCLUDES THE NAMED INSURED AND ALSO INCLUDES ANY DIRECTOR, OFFICER, OR EMPLOYEE THEREOF WHILE ACTING WITHIN THE SCOPE OF HIS DUTIES AS SUCH, AND *INDIVIDUAL LION MEMBERS*, LEO CLUB MEMBERS AND LIONESS MEMBERS WHILE ACTING IN *THEIR CAPACITY AS SUCH OR WHILE ACTING ON BEHALF OF A NAMED INSURED*.

Article III of the Lions Club Constitution and By-laws is entitled "Membership" and states in part:

. . . .

Section B. Membership in this Lions club shall be as follows:

(1) ACTIVE: A member entitled to all rights and privileges and subject to all obligations which membership in a Lions Club confers or implies. Without limiting such rights and obligations, such right shall include eligibility to seek, if otherwise qualified, any office in this club, district or association and the right to vote on all matters requiring a vote of the membership; and such obligations shall include regular attendance, prompt payment of dues, participation in club activities and conduct reflecting a favorable image of this Lions club in the community.

. . . .

(3) HONORARY: An individual, not a member of this Lions club, having performed outstanding service for the community or this Lions club, upon whom this club desires to confer special distinction. This club shall pay the entrance fees and international and district dues on such a member, who may attend meetings, but shall not be entitled to any privileges of active membership.

Catherine Harrison, the former secretary for the Lions Club, testified that Gullett was not the project chairman for the Lions Club. However, Harrison was then presented with deposition testimony in which she stated that Gullett was, technically,

31

the project chairman for the Lions Club. Harrison testified that now that she knows what the term means, he is not the project chairman. She further testified that she and Gullett opened up a special fundraiser checking account in which Gullett was the primary signatory and she the secondary. The checks were used to pay for the Heymann Center, the employees, and anything necessary to put on the show. The Official Minutes of Regular Club Meetings, dated October 2, 1996, states: "MOTION MADE BY LION J.W. TO ACCEPT JOHN GULLETT . . . AS MEMBERS." An October 16, 1996 record of the minutes states: "OUR FUNDRAISER IS ON SCHEDULE. LION JOHN PRESENTED A CHECK FOR $1,500.00 FOR PARTIAL PAYMENT TO US." A November 6, 1996 record of the minutes stated "LION JOHN GULLETT REPORTED THE CONCERT WAS ON SCHEDULE AND GOING WELL." Also admitted into evidence was a copy of the check signed by Gullett, made payable to the Heymann Center. The payee on the check is the "CARENCRO LIONS SPECIAL PROJECTS." Harrison testified that an active member is one who has been invited to join the club that has the rights and privileges of being able to vote or hold office. Said member is required to attend twelve meetings a year and pay dues. Harrison stated that Gullett did not meet that criteria. She further testified that an honorary member is a title bestowed upon a person who has helped the club with community service, and that honorary members do not have any rights or privileges of an active member nor do they pay dues. She stated the club pays their international dues. Harrison testified that the Carencro Lions Club did pay dues on behalf of Gullett to Lions International. On cross-examination it was pointed out that the contract Gullett entered into with Heymann Center/Lafayette was on September 5, 1996, before he was made an "honorary member."

32

L.J. Olivier, a fifteen-year member of the Lions Club, testified that he signed the contract with Gullett on behalf of the Lions Club as acting president. He stated that Gullett was never a member, much less a project chairman. He further stated that the Lions Club did not have a problem with Gullett selling tickets, advertising, signing the lease contract, or setting up the checking account in the name of the Lions Club. He did state that Gullett was nominated to be an honorary member in recognition of the work he had done for them. He further testified that "the main point is he was acting on behalf of the Lions Club but he was not a member of the Lions Club."

Having reviewed Royal's insurance policy and the definition and terms of the Lions Club's Constitution and By-laws, we find that Gullett was not an insured under the policy. Royal argues that Gullett contracted with the Lions Club as a representative of his corporation, J.G. Enterprises, and hence, any actions taken on behalf of the Lions Club were done by the corporation, and not by Gullett as an honorary member of the club. We agree. The evidence is overwhelming that Gullett was essentially in charge of every detail pertaining to the Grand Ole Opry production, including writing checks on an account in the name of the Lions Club and promoting the event. Olivier himself testified that Gullett was "acting on behalf of the club." Gullett was not acting on behalf of the Lions Club in his capacity as a Lion, but as part of his business of promoting events for which he was compensated.

This situation is no different than an undisputably active lion member, who happens to own a grass cutting business, cutting the lawn of the Carencro Lions Club, for pay. In this instance, the member would not be acting on behalf of the club, but would instead be acting on behalf of his business in return for compensation. It would be unreasonable to enlarge Royal's policy provisions to insure any business that

33

it contracts with to "act on its behalf." Instead, we believe this provision applies to Lions Club members acting in their capacity as part of a non-profit volunteer organization.[3] We do not think that Royal envisioned insurance coverage for any person that the Lions Club pays to do work for them. The phrase "acting on behalf of" envisions a Lion member doing something in his capacity as a Lion, i.e., unpaid, such as the members who volunteered to usher at the Grand Ole Opry.

The issue of whether or not Gullett was a member of the Lions Club is of no moment. He was never acting as a Lion in the activities he conducted on behalf of the Club. Rather, he was acting as a promoter, a paid venture. Accordingly, we reverse that portion of the judgment finding that Royal was the insurer of Gullett and cast Gullett solely with that portion of the judgment.

## DAMAGES

In this assignment of error, McDaniel argues that both the trial court and jury's general and special damages award were inadequate. We note that the standard of review used in bifurcated trials as to damages has varied widely. Some courts have used the "more reasonable" standard and others have used the more common abuse of discretion standard and then have gone on to effectively harmonize the awards. Other courts do not mention the abuse of discretion standard and simply harmonize the awards. We feel the same standard set forth in *Hays* should apply to the review of damage awards with one reservation. In *Hays,* the court stated that "there must then be a determination that the findings of fault and apportionment and *the award of damages were reasonable and not manifestly erroneous*." *Hays,* 856 So.2d at 71 (emphasis added). We feel that the long-standing abuse of discretion standard should

---

[3] The issue of whether an honorary member is a member for purposes of insurance coverage is left for another day.

be applied when reviewing general damage awards.[4]  As set forth  in our standard of review on the issue of damages, if neither award is an abuse of discretion, then we will choose the one that is most reasonable.  If we find that either the trial court or jury's finding is an abuse of discretion, we will discard that one and accept the other.  If both are an abuse of discretion, we will discard them both and make our own ruling.  On the other hand, when reviewing special damage awards, we will use the same procedure but will apply the manifest error standard as set forth in *Hays.  See also Thibeaux v. Trotter*, 04-482 (La.App. 3 Cir. 9/29/04), 883 So.2d 1128, *writ denied*, 04-2692 (La. 2/18/05), 896 So.2d 31.

### *General Damages*

McDaniel requests that general damages for past pain, suffering, and disability be raised to $250,000, or in the alternative, that the jury's assessment be found more reasonable; and that general damages for future pain, suffering, and disability, physical and mental and loss of enjoyment of life be raised to $150,000. The trial court's total general damage award was $125,000 ($100,000 for past pain, suffering, and disability and $25,000 for future pain, suffering and disability).  The jury's general damage award totaled $163,250 ($110,523 for past pain, suffering and disability and $52,727 for future pain, suffering and disability).  Having reviewed the evidence, we find that neither the trial court nor the jury abused their discretion in their general damage awards regarding past pain, suffering and disability albeit the awards were on the low side.  However, we find that the trial court's award of $25,000 for future pain, suffering, and disability was an abuse of discretion, but that the jury's

---

[4]  The *Hays* court went on to discuss whether the trial court abused its discretion in its general damage award. However, we want to be clear in distinguishing the manifest error and abuse of discretion standards.  When reviewing the different awards of *general damages*, the abuse of discretion standard applies.

award, although low, was not. Accordingly, we shall accept the jury's general damage award as more reasonable and make it ours for the following reasons.

General damages include an award for the victim's pain and suffering, and as such, are intrinsically speculative and not subject to mathematical certainty. *Wainwright v. Fontenot*, 00-0492 (La. 10/17/00), 774 So.2d 70. We review the factfinder's general damage award using the abuse of discretion standard set forth in *Coco,* 341 So.2d 332. The trier of fact is afforded much discretion in independently assessing the facts and rendering an award because it is in the best position to evaluate witness credibility and see the evidence firsthand. *Anderson v. New Orleans Pub. Serv., Inc.,* 583 So.2d 829 (La.1991). The award should be based on the facts and circumstances of the particular case. *Id.* Only if we find that the factfinder abused its discretion, may we lower to the highest reasonable amount or raise the award to the lowest reasonable amount and resort to prior awards to the extent that is reasonably within our discretion. *Youn v. Maritime Overseas Corp.,* 623 So.2d 1257 (La.1993), *cert. denied,* 510 U.S. 1114, 114 S.Ct. 1059 (1994).

McDaniel testified that he has been a singer, songwriter, and entertainer since 1976, has made sixteen albums, has a star on the Country Music Walk of Fame, and is a member of the Grand Ole Opry.

He testified that prior to the accident he suffered from high blood pressure, diabetes, urinary and prostate infections, and had undergone open-heart surgery. He also stated that he was taking Darvocet for sinus pain and overall aches and pains. However, McDaniel stated that he was not having any problems with his neck, right shoulder, or knees. He testified that he had carpal tunnel surgery in 1992 or 1993, which alleviated pain he was having in his wrist. He stated that none of these previously existing conditions interfered with his ability to work.

36

McDaniel testified that he was taken by ambulance to the hospital and that he hurt all over following the accident. He testified that he underwent carpal tunnel surgery on his right hand and right knee surgery following the accident. In the summer of 1997, his shoulder was operated on. He further stated that he has continued neck, back, and leg pain and that he was taking OxyContin and Celebrex three times a day at the time of trial. McDaniel testified that he was unable to return to his normal touring and performance schedule until December 2000. He stated that he uses a cane when he walks and that he can not walk long distances, has trouble sleeping, and has continued neck, back, and shoulder pain. He testified that he can no longer use his guitar on stage because he can not carry it. McDaniel testified that he had previously been diagnosed with depression and anxiety. At the time of the accident, McDaniel was taking Darvocet, Zanax, and Prozac.

Dr. Michael Heard, an orthopedic surgeon, testified that he treated McDaniel from December 26, 1996, until August 6, 1997. Dr. Heard reported that McDaniel stated that he had pain in his right shoulder, arm, and leg, and in his knees, lower back, and neck. Dr. Heard testified that a December 12, 1996 MRI revealed degenerative changes at the L-2-3, 3-4 and at L5-S1. Dr. Heard opined that the degenerative changes probably preceded the fall, but not the herniation. When asked whether McDaniel's injuries, including his neck, back, right shoulder, right knee, and ulnar nerve injury were based on reasonable medical probability, caused by the November 14 fall, he responded:

> It appears that the fall of 11/12/96 caused his right shoulder to become symptomatic and probably caused the tear in his – in his rotator cuff that necessitated the subsequent surgery, probably caused the pain in his neck into his arm, probably caused the compression of the ulnar nerve and aggravated the median nerve at the site of the previous surgery of the carpal tunnel release, probably caused the low back pain and radiating-type pain down into his – leg, probably tore the medial meniscus and caused the chondral lesion in his –in his right knee.

37

Dr. Heard further testified that McDaniel was unable to work during the time that he saw him, up until August 6, 1997, but that he had no opinion as to his work capabilities after that time.

Dr. Eric Eckman, a diagnostic radiologist and pain management physician, began treating McDaniel in March 1998. He testified that he performed a discogram, a diagnostic test to assess the functional integrity of an intervertebral disc. The first procedure was a lumbar discogram. The procedure involved placing a needle through the muscles of the back, in between the vertebrae, into the intervertebral disc, and into the center of the disc. Dr. Eckman's findings were that there was evidence that the L5-S1 disc was actively producing back and hip pain, that the L3-4 disc was questionable, and the L2-3 and L4-5 discs were normal.

Dr. Eckman also performed a discogram of the neck which produced findings that pain was coming from the lower three cervical discs. Dr. Eckman's opinion was that the symptoms McDaniel was experiencing in his neck and lower back were related to the November 1996 fall. He saw McDaniel again in October 1998, at which time he performed lumbar rhizotomies, which involve injecting Phenol into the nerves of the back in order to anesthetize it and reduce McDaniel's back pain. In December 1998, McDaniel complained of neck, thoracic, and right upper-extremity pain, as well as lower back pain radiating into his legs. Dr. Eckman reported that McDaniel was taking Darvocet two to six times per day, Glucophage, Amaryl, and Lortab. Dr. Eckman prescribed Neurontin, an anti-epileptic drug, to help with the pain. At this visit, Dr. Eckman also performed a sclerotherapy, which again involved injecting Phenol into the sacroiliac joints as a means of numbing the pain. Dr. Eckman stated that the procedure is very painful. Dr. Eckman repeated the procedure on McDaniel in January 1999. He testified that during the period of time he treated

McDaniel, he was "pretty beat up" and that he did not think he would be able to work as a musician. Dr. Eckman testified that McDaniel switched to Dr. Scott Anthony after the January 1999 visit, because he was in his home area whereas trips to see Dr. Eckman required two to three hours of travel time.

Dr. Scott Anthony, an anesthesiologist and pain management specialist, began treating McDaniel in January 1999. He was referred to him by Dr. Hayes (his orthopedic surgeon). Dr. Anthony stated that McDaniel complained of neck, back, arm, and leg pain. His physical exam revealed that McDaniel's cervical muscles were in spasm due to underlying disc injuries; he had poor mobility in his lumbar spine, and his neurological evaluation was normal except for slight grip-strength decrease and weakness on the right side. He diagnosed him with chronic injuries due to cervical and lumbar degenerative disc disease, as well as depression and anxiety. He attributed McDaniel's severe neck and back pain to the 1996 fall. Dr. Anthony recommended steroid injections, physical therapy, and rehabilitation therapy. McDaniel began attending physical therapy but discontinued because it was over seventy-five miles away from his home and he did not feel it was benefitting him.

In February 1999, McDaniel received cervical and lumbar steroid injections (which require IV sedation) to reduce inflammation. The injections were made in the epidural space and were described by Dr. Anthony as being relatively painless. In late February 1999, McDaniel had a second set of steroid injections in his neck and back. Dr. Anthony stated that he was somewhat improved at this time.

In March 1999, McDaniel was still having considerable neck and low back pain. Dr. Anthony prescribed Oxycontin for pain, Celebrex for arthritic and inflammatory type pain, and Celexa, an anti-depressant. The steroid injections were repeated in June and September 1999.

In November 1999, McDaniel was doing better, although still in pain. Dr. Anthony increased all three of his medications and conducted a physical exam that revealed pain with range of motion in the cervical and lumbar spines and a normal neurological exam. He diagnosed him with persistent shoulder pain, degenerative disc disease, and cervical and lumbar pain. In December 1999 and February 2000, McDaniel again had the steroid injections in his neck and back.

In March 2000, McDaniel was having right arm and lower extremity pain. He was again given steroid injections, which gave him moderate improvement in his pain levels. His medications were again increased. In June 2000, McDaniel complained of increasing right arm pain. Dr. Anthony suspected carpal tunnel and ordered an EMG (nerve conduction study). A physical exam revealed pain in the neck and back and sensory loss on the C6 nerve route.

By March 2001, McDaniel was still having neck and back pain, but he had returned to performing. His mood was better. Dr. Anthony increased his pain medication and discussed the placement of a morphine pump. In his testimony, Dr. Anthony stated that McDaniel would have been unable to work prior to his first 2001 visit and for six to eight months into his treatment with him. In April 2002, Dr. Anthony felt that McDaniel had chronic neck, back, and right shoulder pain. A physical exam revealed bursitis of the shoulder and pain and muscle spasms in the neck and lower back. McDaniel was given some samples of Bextra, a new anti-inflammatory.

Dr. Anthony testified that overall, McDaniel would improve slowly, but would never be pain free and would regain functionality over time. He stated that the neck and back pain would be persistent, but he hoped it would stabilize. He described his limitations: no lifting over twenty-five pounds, use of an assistive device (cane)

when standing for long periods, and limited twisting and bending. Dr. Anthony stated that McDaniel would need to see him once every six months. He further stated that he believed the neck, back, and shoulder injuries were caused by the fall.

On cross-examination, Dr. Anthony testified that McDaniel had reported having depression and anxiety prior to the fall. He further testified that McDaniel reported having low back pain prior to the fall, but that it was not nearly as severe. He further reported having previous carpal tunnel surgery. Dr. Anthony testified that although the fall did not cause the degenerative disc disease, it exacerbated it. He further stated that it would be difficult to differentiate whether the second carpal tunnel surgery after the fall was due to the fall or because of scar tissue. Finally, he stated that McDaniel was very cooperative, and Dr. Anthony believed he wanted to improve. He also stated that his complaints were consistent with a falling injury.

Dr. James Cash, an orthopedic surgeon, first saw McDaniel in September 1997, regarding the pain he was having in his right shoulder. Dr. Cash found that McDaniel was tender over his acromial clavicular joint, that he was painful with several areas of motion in his shoulder, that he had weakness in some muscular strength areas around the shoulder, but that his shoulder stability was good. Dr. Cash believed that McDaniel's right shoulder had previously been dislocated and that he possibly had a rotator cuff tear. Dr. Cash saw McDaniel again in October 1997. An arthogram indeed revealed a partial tear of his rotator cuff, and a physical exam showed some improvement in his ability to move his arm and in his strength. Dr. Cash also administered a subacromial injection of a steroid and numbing medicine into the shoulder area. Dr. Cash saw McDaniel again in November 1997, at which point McDaniel decided to undergo surgery on his shoulder to relieve some of the pain. Surgery was performed on December 8, 1997. The surgery revealed that McDaniel

41

had some tearing of the undersurface of the rotator cuff tendon, several fragments of bone that were imbedded within the tendon, and partial tearing of the lining of the ball and socket joint. The areas that were partially torn and frayed were trimmed away to a smooth edge. Dr. Cash saw McDaniel again on December 16, 1997, at which time his sutures were removed and a physical therapy program was instituted. Visits in late December 1998, and late January 1999, showed that McDaniel's ability to move his shoulder was improving. Dr. Cash last saw him in early March 1998, at which time he felt that McDaniel was doing very well. He was able to fully raise his arm over his head, had good strength, and internal and external rotation. Dr. Cash testified that assuming McDaniel did not have shoulder pain prior to the November 1996 accident, he would attribute the problems in his shoulder to the fall.

Dr. John Schutte, an orthopedic surgeon, conducted an examination of McDaniel at the request of the defendants on September 27, 2001. He also reviewed McDaniel's medical records. Dr. Schutte was of the opinion that McDaniel had degenerative arthritis or cervical spondylosis of his neck and back. He stated that this is an arthritic condition that occurs with daily wear and tear and the use of the body. He further testified that he did not believe that McDaniel suffered from a severe brachial plexus problem. He also testified that rotator cuff tears are normal from wear and tear factors over the course of a patient's life. He stated that there were no signs that he had an acute tear relating to the fall. Regarding McDaniel's knee injury, Dr. Schutte found that the medial meniscus had a small frayed area, which was not significant and that he would not associate any symptoms with it. He again classified it as a wear and tear type of injury that is not unusual for a person of McDaniel's age. He stated that nothing on the photograph he examined led him to believe that the fraying resulted from the fall. Dr. Schutte opined that McDaniel's ongoing problems

that existed at the time of trial are a result of degenerative arthritis of his neck and back, rather than from the fall.

It is clear that McDaniel suffered substantial injuries as a result of the nearly seven-foot fall onto a concrete floor. He has undergone several surgeries to repair his shoulder and knee. We did not find Dr. Shutte's testimony persuasive. To imply that all of these ensuing injuries and surgeries were due to routine wear and tear from aging seems preposterous. The defendants make much of McDaniel's pre-existing conditions, but it is horn book law that you take your victim as you find him. The evidence was overwhelming that the fall caused injuries and exacerbated existing problems. Undoubtedly, McDaniel has been in pain for years from these injuries. Additionally, he can no longer use his guitar as a stage prop and is embarrassed that he must use a cane. Accordingly, we find the jury did not abuse its discretion in awarding $163,250 in general damages and that it is more reasonable.

### Special Damages

McDaniel requests in this assignment of error that the award for past medical expenses be raised to $125,127.01 or, in the alternative, that the trial court's award is more reasonable than the jury's award; that future medical expenses be increased to $152,753 or, in the alternative, that the jury's award was more reasonable than the trial court's award; and that past lost wages be increased to $218,118 or, in the alternative, that the jury's award was more reasonable. The trial court's special damages award totaled $147,589 ($87,589 for past medical expenses; $0 for future medical expenses; and $60,000 for past lost wages). The jury's special damages award totaled $232,348 (past medical expenses of $73,830; future medical expenses of $53,636; and, past lost wages of $104,882).

Special damages are those damages which may be determined with some degree of certainty and include past and future medical expenses and past and future lost wages. *Wainwright,* 774 So.2d 70. The plaintiff bears the burden of proving entitlement to special damages by a preponderance of the evidence. *Cormier v. Colston,* 05-0507 (La.App. 3 Cir. 12/30/05), 918 So.2d 541. The award of future medical expenses must be supported by medical testimony indicating both their need and probable cost. *Holliday v. United Servs. Auto. Ass'n,* 569 So.2d 143 (La.App. 1 Cir. 1990).

As we stated in our standard of review set forth earlier in this opinion, we shall review both the trial court's and jury's verdicts in the same fashion we reviewed general damages except we shall use the manifest error standard of review.

***Past Medical Expenses***

The trial court awarded McDaniel $87,589 for past medical expenses, while the jury awarded him $73,830. Having reviewed the evidence, we do not find either of these awards to be manifestly erroneous. The trial court discounted past medicals by 30% finding that some of the treatment was unrelated to the accident. Apparently, the jury agreed based on its award. Because there was evidence that McDaniel had pre-existing conditions that would have required treatment, we do not feel that the trial court or jury's past medical expenses award is manifestly erroneous. However, we find that the trial court's award is more reasonable. Accordingly, McDaniel is awarded $87,589 for past medical expenses.

***Future Medical Expenses***

The trial court awarded McDaniel $0 for future medical expenses, while the jury awarded him $53,636. In order to meet his burden of proof on the issue of future medical expenses, McDaniel must show that, more probably than not, these

44

expenses will be incurred and must present medical testimony that they are indicated and the probable cost of these expenses. *Veazey v. State Farm Mut. Auto Ins.,* 587 So.2d 5 (La.App. 3 Cir.1991).

Having reviewed the record, we feel that McDaniel proved that he was entitled to an award for future medical expenses for pain management and medication. We find it was manifestly erroneous for the trial court to award $0 for future medical expenses based on Dr. Schutte's testimony. On the other hand, we find no manifest error in the jury's finding of $53,636 for future medical expenses. Therefore, we shall adopt the jury's findings as our own. In *Green v. K-mart Corp.*, 03-2495, p. 5 (La. 5/25/04), 874 So.2d 838, 843, the supreme court discussed the factfinder's role in assessing future medical expenses:

> Credibility determinations are for the trier of fact, even as to the evaluation of expert witness testimony. *Sportsman Store v. Sonitrol Sec. Systems*, 99-0201 p. 6 (La.10/19/99), 748 So.2d 417, 421; *Lirette v. State Farm Ins. Co.,* 563 So.2d 850, 853 (La.1990). A fact-finder may accept or reject the opinion expressed by an expert, in whole or in part. *Lirette*, 563 So.2d at 855. The trier of fact may substitute common sense and judgment for that of an expert witness when such a substitution appears warranted on the record as a whole. *Sportsman Store*, 99-0201 p. 9, 748 So.2d at 422; *see also Barber Bros. Contracting Co. v. Cuccia*, 98-0675 p. 8 (La.App. 1 Cir. 4/1/99), 734 So.2d 820, 825, *writ denied*, 99-1258 (La.6/18/99), 745 So.2d 31; *Goodwin v. Goodwin*, 618 So.2d 579, 586 (La.App. 2 Cir.1993), *writ denied*, 623 So.2d 1340 (La.1993).

Dr. Charles Bettinger, a forensic economist and statistician for more than thirty years, calculated McDaniel's future medical costs based on his daily prescriptions (Oxycontin and Celebrex), as well as two office visits per year. He determined his annual future medical costs to be $8,733 per year, with an average life expectancy of 20.5 years, for a total of $169,970. Dr. Bettinger testified that McDaniel's total bottom line economic loss totaled $378,088.

It was not unreasonable for the jury to discount Dr. Bettinger's estimate based on a number of factors such as contradictory testimony, common sense notions

that the injuries will resolve themselves to the point that medical treatment is no longer needed, and the jury's opportunity to view McDaniel in person. Accordingly, McDaniel is awarded $53,636 for future medical expenses.

***Past Lost Wages***

The trial court awarded McDaniel $60,000 for past lost wages, while the jury awarded him $104,882. We find neither of these awards manifestly erroneous, but we find the jury's award is more reasonable. Joe Taylor, a talent agent for more than forty years, testified that he was McDaniel's agent at the time of the accident in 1996. Taylor stated that McDaniel was fine, had no problems whatsoever, and was eager to work prior to the accident. He testified that McDaniel played thirty-two shows from February 1996, through November 1996, and additionally had his spots at the Grand Ole Opry when the accident occurred. Taylor stated that McDaniel had twenty-eight shows booked for 1997 that had to be cancelled. Taylor testified that he resumed booking shows for McDaniel in December 2000, but not to the extent that he did before.

Dr. Bettinger extensively discussed the methodology he used in determining McDaniel's lost wages. He arrived at a yearly average income of $51,431, with a total wage loss from the time of the accident until December 2000 of $208,118.

In *Boyette v. United Services Automobile Association,* 00-1918, p. 3 (La.4/3/01), 783 So.2d 1276, 1279, the supreme court stated:

> To recover for actual wage loss, a plaintiff must prove that he would have been earning wages but for the accident in question. *See, Rhodes v. State Through Dep't of Transp. & Dev.,* 94-1758 (La.App. 1 Cir. 12/20/96), 684 So.2d 1134*, writ not considered,* 97-0242 (La.2/7/97), 688 So.2d 487; *Hunt v. Board of Supervisors of Louisiana State University and Agricultural and Mechanical College*, 522 So.2d 1144, 1152 (La.App. 2 Cir. 1988). In other words, it is the plaintiff's burden to prove past lost earnings and the length of time missed from

work due to the accident. *See, ANMAC Foundation, Inc. v. St. Patrick Hospital of Lake Charles*, 594 So.2d 951, 956 (La.App. 3 Cir. 1992).

The trial court and jury found that McDaniel proved past lost wages. Again, however, it was not unreasonable to discount the amount offered by Dr. Bettinger. At trial, it was apparent that McDaniel did not file tax returns for several years and had little explanation for his failure to do so. However, McDaniel did have regular appearances at the Grand Ole Opry and had twenty-eight shows booked for 1997, that had to be cancelled. The jury essentially awarded McDaniel two years worth of past lost income, apparently believing that he could have returned to work sooner or would have earned less income than the annual $51,431 Bettinger testified to. Either is reasonably supported by the record. Dr. Heard testified that he did not believe McDaniel could work up until his last visit with him in August 1997. Dr. Eckman treated McDaniel through January 1999, and also testified that he did not think McDaniel would be able to work as a musician during that time. McDaniel testified that he did not resume working until late 2000. Accordingly, McDaniel is awarded $104,882 for past lost income.

### Quotient Verdict

Lafayette urges that in addition to the jury's manifestly erroneous finding of fault, their use of a "quotient verdict" is an impermissive and prohibited practice rendering their verdict unreasonable and clearly manifestly erroneous. A quotient verdict is one in which each of the jurors agree to submit a proposed damage award that is thereafter totaled and divided by twelve to reach an average. *Ritchey v. Dees*, 540 So.2d 1265 (La.App. 3 Cir. 1989), *writ denied*, 542 So.2d 1387 (La.1989). Use of quotient verdicts is not favored "because they preclude full deliberation on the issues and cause abandonment by some or all jurors of their conscientious convictions

on material issues." *Id.* at 1269.  In November 2004, Lafayette proffered the affidavit of juror Kenneth Rainey, in which he states:

1)  That he was one of the jurors who heard the trial of the above captioned litigation from June 1-4, 2004;

2)  That after the close of evidence, the jury was instructed and did retire to the jury room to deliberate;

3)  That, while discussing the case, one juror did note a pre-existing appointment on that same late afternoon and a desire to attend that appointment.

4)  That in an effort to accommodate that juror, a decision was made that the foreperson would request a calculator from the judge, that each person would write out on a secret ballot his or her opinion of what the verdict should be, and that all jurors would agree to add the figures together and divide by the number of jurors and agree to render a verdict consistent with that average of the jurors' secret ballots.

5)  That the foreperson did request and receive the aforementioned calculator, each juror prepared his/her secret ballot, that the ballots where averaged and that the jury rendered a verdict consistent with that average, as per their agreement.

Although the jury's method is disfavored, it would be more unreasonable for us to declare that the jury's verdict is "hopelessly flawed" because of the manner in which it was obtained.  Overall, we found the jury's findings regarding liability and damages to be reasonably supported by the record.  Although we do not condone the use of the quotient verdict, in our opinion the method, in this particular case, produced a fair and equitable result. Additionally, the affidavit states that the jury rendered a "verdict consistent with that average," rather than stating that the verdict resulted from the actual average.  That implies that further discussions and deliberations ensued before reaching a verdict.  Accordingly, we will not set aside the jury's findings based on the use of an improper method.  This assignment of error is without merit.

48

## EXPERT WITNESS FEES

McDaniel next argues that the trial court erred in awarding Patin only $250 for trial and pre-trial work when his trial and pre-trial fees totaled $35,253.10. The trial court has great discretion in awarding costs including expert witness fees, which will not be reversed on appeal in the absence of an abuse of discretion. *Olsen v. Johnson*, 99-783 (La.App. 3 Cir. 11/3/99), 746 So.2d 740. Further, the trial court is not required to set the expert witness fee at the amount charged by the expert witness. *Trahan v. Savage Indus., Inc.*, 96-1239 (La.App. 3 Cir. 3/5/97), 692 So.2d 490, *writs denied,* 97-1636, 97-1652 (La. 10/3/97), 701 So.2d 207, 209.

Having reviewed the record, we find it was an abuse of discretion for the trial court to award Patin only $250. Although we found most of Patin's testimony flawed and unpersuasive, he did survey the property, conduct lighting tests, and review various literature along with conducting the survey, and agreed to testify regarding these issues. We think a more reasonable fee for his services would be $3,000. Accordingly, the trial court's award for Patin's fees is increased from $250 to $3,000.

## COURT COSTS

We review the trial court's award of court costs using the same abuse of discretion standard. *Olsen,* 746 So.2d 740. The trial court assessed court costs according to the percentages of fault assessed to each party. We amend the award of court costs to reflect the percentages of fault set forth in this opinion.

## SUMMARY

Lafayette, the Lions Club/Royal, and Gullett are cast in judgment as follows for the total of special and general damages ($409,357) as follows:

Lafayette (65%)                    $266,092.05

Gullett (8%)                    $32,748.56

Lions Club/Royal (2%)           $8,187.14

## CONCLUSION

The judgment of the trial court is amended to assess fault to the defendant-appellant, Lafayette City-Parish Consolidated Government, in the amount of 65%, to the defendants-appellants, Carencro Lions Club/Royal Insurance Company, in the amount of 2%, and to the defendant-appellant, John Gullett d/b/a J.G. Enterprises, Inc., in the amount of 8% of the $409,357 in general and special damages. That portion of the judgment finding that Royal was the insurer of Gullett is hereby reversed. The award of expert fees to Fabian Patin is increased from $250 to $3,000. The assessment of court costs is amended to reflect the percentages of fault adopted in this opinion. Costs of this appeal are assessed using the same fault percentages adopted in this opinion.

**AFFIRMED IN PART, REVERSED IN PART, AND RENDERED.**

**STATE OF LOUISIANA**
**COURT OF APPEAL, THIRD CIRCUIT**

**05-1013**


**MEL MCDANIEL**

**VERSUS**

**CARENCRO LIONS CLUB, ET AL.**


**THIBODEAUX, CHIEF JUDGE, CONCURRING.**


I concur in the result reached. However, I would reach that result by applying a *de novo* standard of review in a bifurcated case, such as this one, where there are conflicting verdicts for the reasons stated as the authoring judge in 05-471, *Hebert v. Rapides Parish Police Jury, et al.* (La.App. 3 Cir. 7/12/06), ___ So.2d ___.